RICH PLAN OF NORTHERN NEW ENGLAND, INC., WILLIS E. PETHIC and NANCY E. PETHIC, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
RICH PLAN OF NORTHERN NEW ENGLAND, INC. v. COMMISSIONER
Docket No. 5176-77.
United States Tax Court
T.C. Memo 1978-514; 1978 Tax Ct. Memo LEXIS 1; 37 T.C.M. (CCH) 1853-8; December 28, 1978, Filed Charles F. Leahy, for the petitioners. Daniel P. Ehrenreich, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined the following deficiencies in Federal corporate income taxes of petitioner Rich Plan of Northern New England, Inc.: Taxable Year
Deficiency
1973
$ 15,668
1974
22,056
*2 The Commissioner further determined a deficiency in Federal income tax for 1973 in the amount of $726 against petitioners Willis E. Pethic and Nancy E. Pethic. After concessions by the corporate petitioner, the sole issue for our decision is whether a portion of the compensation for personal services paid by the corporation in 1973 and 1974 to the individual petitioners was unreasonable and therefore nondeductible by the corporation and taxable to the individual petitioners as a dividend. [1]
FINDINGS OF FACT The parties have filed a stipulation of facts which, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioner Rich Plan of Northern New England, Inc. ("Northern New England") is a New Hampshire corporation incorporated in 1958. At the time its petition herein was filed, the corporation's principal offices were located in Pittsfield, New Hampshire. Northern New England filed its Federal income tax returns *3 for the taxable years 1973 and 1974 with the Director, Andover Service Center, Andover, Massachusetts. Northern New England operates on a calendar year for income tax purposes. Petitioners Willis E. Pethic and Nancy E. Pethic, husband and wife, resided in Pittsfield, New Hampshire, at the time their petition herein was filed. Their 1973 joint Federal income tax return was filed with the Director, Andover Service Center, Andover, Massachusetts. Prior to the incorporation of Northern New England, Everett L. Pethic, father of petitioner Willis E. Pethic, and petitioner Willis E. Pethic had operated a food freezer plant and custom meat slaughtering business as a partnership. The business consisted of renting food lockers to customers and selling frozen foods to them. Such foods included fruits, vegetables, and juices, which were processed at the plant, and, with the passage of time consisted primarily of meats, which were derived from animals slaughtered at the plant. Helen M. PETHIC, MOTHER OF PETITIONER Willis E. Pethic, and petitioner Nancy E. Pethic, were employed by the partnership. [2]
*4 At some time after the partnership commenced, Willis Pethic determined that the food locker and custom slaughtering business had a very limited potential in the New Hampshire area. Thereafter, in 1958, Everett Pethic and Willis Pethic were approached by the Rich Plan Corporation (the "national Rich Plan Corporation") and solicited to become a Rich Plan franchised dealership in New Hampshire. The basic function performed by a Rich Plan franchisee is the retail credit sale of food freezers and a variety of frozen foods to stock customers' home freezers. Apart from meats generally, such frozen foods were acquired and sold by the franchisee in packaged form under the Rich Plan label. As to most meats, at least in the case of petitioner corporation, the food was acquired in carcass form from a packer, and was cut, trimmed, wrapped, and frozen in the plant. The Pethics decided to accept the offer. Petitioner Northern New England was incorporated by the Pethics, and it entered into a franchise agreement with the national Rich Plan Corporation. The shareholders and officers of petitioner Northern New England at the time of its formation and until 1970 were as follows: Number
Officership Name
of Shares
Held
Everett L. Pethic
300 shares
President
Helen M. Pethic
5 shares
Assistant Treasurer
Willis E. Pethic
300 shares
Vice-President
Nancy E. Pethic
5 shares
Treasurer
*5 When Northern New England was first incorporated, it continued its custom slaughtering and food locker rental business along with its new responsibilities as a Rich Plan franchisee. However, the non-Rich Plan business was grandually phased out over a number of years. Northern New England originally did business only in New Hampshire. Its operations were expanded into Vermont and Maine in the mid-1960's as a result of a request by the national Rich Plan Corporation to take over these territories from other franchisees whose businesses had failed. [3]
During the years at issue and since its inception, the business of Northern New England, like that of other Rich Plan franchisees, involved three interdependent and important activities: food processing, direct sales to the ultimate consumer of home freezers and food products ("direct sales program"), *6 and consumer financing. In 1973 and 1974, between two-thirds and four-fifths of Northern New England's food sales were of meat products which it processed. Approximately 14 meat cutters and wrappers were employed by Northern New England to process this meat. The remainder of its food sales during 1973 and 1974 were Rich Plan private label preprocessed food products such as fruits, vegetables, juices, and some prepackaged meats (e.g., frankfurters, bologna, and sausages). In addition to food, Northern New England sold home freezers to approximately 40 percent of its customers. The direct sales program, which had obtained some 6,000 to 7,000 customers in 1973 and 1974, was operated through a sales force of 40 commission salesmen working out of regional offices in Concord, New Hampshire, Portland, Maine, and Burlington, Vermont. Northern New England was, during the years at issue, involved in extensive consumer credit activities. Freezer sales to individual customers were financed by loans from banks or finance companies to the customers under arrangements giving the lenders full recourse against Northern New England in the event of nonpayment. Northern New England itself *7 financed customers' credit orders for food. To minimize its credit risks, Northern New England had its own credit analysis and approval program in connection with its credit sales of food and freezers. Prior to the death of Everett L. Pethic in 1970, the duties of the shareholders and officers of Northern New England were as follows: Petitioner Willis E. Pethic developed and supervised the sales force, the financial aspects of the business and the retail credit operation. In the course of his duties, he personally performed virtually every task involved in the three separate aspects of the corporation's business, namely, food processing, direct sales, and consumer credit. Although Everett L. Pethic nominally was president of the corporation, Willis was ultimately responsible for all matters of business judgment. At this time, Willis Pethic served as director and for five years as president of the national Rich Plan Corporation after the national corporation was purchased by a group of Rich Plan franchisees in the 1960's. The duties of petitioner Nancy E. Pethic in the early years of the corporation included some meat cutting, but she also took on important financial and other *8 executive responsibilities. As credit manager, she approved customer credit, handled various aspects of consumer financing by lenders, and she managed the inventory and delivery of customer orders. Nancy was also the corporate bookkeeper, and she prepared rough budgets and cash flow analyses. Her work was full time during this period. Everett L. Pethic performed such tasks as the physical work around the processing plant and delivery of freezers and food orders to customers. He was consulted in business matters by Willis Pethic. Helen Pethic was active in the business during the early period, but her duties are not disclosed by the record. Everett L. Pethic died in June, 1970. In January, 1971 pursuant to a stock purchase agreement entered into in 1958, Northern New England redeemed Everett L. Pethic's stock in the corporation for $60,000. At the same time, Northern New England redeemed Helen Pethic's five shares of stock for $1,000 and accepted her resignation as an officer, director and employee. In 1971, Willis Pethic became president of Northern New England, and Nancy Pethic assumed the position of vice-president in addition to her previous job as treasurer. *9 From 1971 through 1974, the issued and outstanding shares of Northern New England were held as follows: Year
Willis Pethic
Nancy Pethic
1971
300
5
1972
300
5
1973 [4]
280
25
1974
280
25
During 1973 and 1974, the most important part of Willis Pethic's job as president was to oversee all of the various parts of the business and to supervise managerial personnel who had direct control over its operations. Most of his time was spent in meetings with the managers, some at monthly or weekly intervals.Willis Pethic also engaged in a variety of special projects, such as developing a more efficient technique of meat cutting, and devising a standardized technique for recruiting salesmen. As president, he was the official charged with the planning functions in the company. One manager under the supervision of Willis Pethic was the "plant manager," a vice-president directly below Willis Pethic in the organization. The plant manager was responsible for everything taking place in the processing plant, including processing and packaging meat, scheduling *10 and making deliveries, hiring employees in the plant, maintaining the delivery trucks, and supervising or performing the credit review function. Another such executive was "sales director" or "general manager," occupying a position of about equal stature to the plant manager in the management structure. The sales director in turn supervised three regional sales managers, one for each regional office. The sales director and regional sales managers were personally responsible for such matters as recruitment and implementation of motivational sales contests, subject to Willis Pethic's approval. In 1973 and 1974, Nancy Pethic's principal duty was to supervise a full-time bookkeeper, to provide Willis Pethic with certain financial data for management purposes, and to close the books of the corporation each month, a task that took two weeks per month of full-time work. In 1974, she worked with Willis Pethic and a computer specialist to computerize the bookkeeping system, [5] and she assisted Willis Pethic in developing a new sales program. Nancy had no supervisory duties or other regular executive responsibilities in areas other than bookkeeping; she no longer had direct responsibility *11 for the credit review function. Instead, she was available to and did fill a wide variety of nonsupervisory jobs, including meat cutting, whenever a special need arose. Her value to the business extended beyond specific tasks: she was Willis Pethic's "troubleshooter" and advisor. Because she did some work at home, such as financial planning, Nancy considered herself a full-time employee during the years at issue even though she did not work full-time at the plant. Over the years, Northern New England has become the second largest Rich Plan franchisee in the country based on volume. Northern New England's sales income before and after taxes and retained earnings (1969 through 1974 only) for the years 1960 through 1974 are set forth in the following table: TABLE 1 (1)
(2)
(3)
(4)
(5) Year
Sales
Before Taxes
After Taxes
Retained Earnings
1960 $ 903,814
$ 15,908
$ 11,140
1961
781,757
(9,965)
(9,965)
1962
598,794
4,675
3,282
1963
678,004
24,789
17,587
1964
902,120
28,193
2 1,426
1965
1,115,346
22,104
17,612
1966
1,157,926
23,253
18,604
1967
1,199,828
29,463
22,593
1968
1,353,958
28,282
21,242
1969
1,651,979
52,199
31,910
$ 149,880
1970
1,965,960
60,693
37,494
177,193
1971
2,130,735
65,196
40,833
211,022
1972
2,264,523
61,681
39,503
249,350
1973
3,172,765
100,936
60,772
307,671
1974
3,819,963
170,147
96,863
405,820
*12 Northern New England has never paid dividends from the time of its formation through the year 1974. The total non-deferred compensation paid Everett Pethic, Helen Pethic, Willis Pethic and Nancy Pethic from 1960 through 1974, and the compensation paid to the plant manager, sales director (also referred to as a general manager), and the three regional sales managers (sum total) from 1970 through 1974, was as set forth in the following schedule: TABLE II (1)
(2)
(3)
(4)
(5)
(6)
(7)
(8)
Everett
Helen
Willis
Nancy
Plant
Sales
Regional Year
Pethic
Pethic
Pethic
Pethic
Manager
Director *
Sales Managers *
1960
$12,000
$1,560
$12,000
$ 1,560
1961
12,000
1,560
12,000
1,560
1962
8,490
2,020
8,490
2,020
1963
9,360
2,600
9,360
2,600
1964
14,668
2,600
1 5,168
2,600
1965
18,548
2,600
20,670
2,600
1966
22,100
22,360
1,285
1967
31,815
750
33,515
1,210
1968
29,509
582
29,264
2,500
1969
30,155
32,465
2,530
1970
24,782
40,000
4,871
$11,024
$19,785
$ 36,811
1971
47,450
23,081
11,495
18,916
42,709
1972
54,794
24,400
11,965
19,664
54,198
1973
53,811
28,860
13,270
24,250
72,332
1974
70,000
30,000
14,655
29,651
78,754
*13 The corporation's salesmen, some 40 in number, were paid on a strictly commission basis during 1973 and 1974, and earned in the aggregate $168,578 and $187,506 for these years, respectively. However, some 6 or 7 of the salesmen accounted for a disproportionately large percentage of these commissions. Also, the corporation expended additional amounts -- possibly about $20,000 each year -- for prizes or other benefits for its salesmen in connection with sales competitions. Ratios derived from tables I and II for the years 1965 to 1974 are set forth below: TABLE III
(3)
(5)
Willis' Salary
Nancy's Salary
(2)
as Percentage
(4)
as Percentage
Willis'
of Income
Nancy's
of Income
Salary
Before Taxes
Salary
Before Taxes (1)
as Percent-
and Salaries to
as Percent-
and Salaries to Year
age of Sales *
Willis & Nancy **
age of Sales ***
Willis & Nancy ****
1965
1.9%
45.6%
.2%
5.7%
1966
1.9
47.7
.1
2.7
1967
2.8
52.2 .1
1.9
1968
2.2
48.7
.2
4.2
1969
2.0
37.2
.2
2.9
1970
2.0
37.9
.2
4.6
1971
2.2
35.0
1.1
17.0
1972
2.4
38.9
1.1
17.3
1973
1.7
29.3
.9
15.7
1974
1.8
25.9
.8
11.1
*14 Northern New England paid relatively low salaries to Willis, Nancy, and Everett L. Pethic during the early years of its operation due to its need for operating capital. In fact, although Nancy Pethic rendered substantial services, her salary was initially designed not to reflect her worth to the business, but rather to approximate family baby sitting expenses incurred so that she could work full time. The salaries of Willis and Everett Pethic were increased in the late sixties when the fortunes of the business improved. Nancy Pethic's salary was also substantially increased after the death of Everett Pethic in 1970, which had the result of decreasing overhead expenses because of the elimination of Everett's salary. The purpose of the increase was in part to compensate Nancy for services rendered in previous years when her compensation was much lower. After Everett *15 Pethic's death, Willis and Nancy had exclusive authority to determine their own salaries. Basic salary decisions for each year were usually made in October when the yearly profits of the business could be projected from previous monthly financial statements. Included in Willis Pethic's $70,000 nondeferred compensation for 1974 was a year-end bonus of $5,600 (based on profits for 1974) as well as an additional aggregate amount of approximately $11,000 which had been advanced to him from time to time during the year and which was later treated as additional compensation by the corporation's accountant when he closed the books after the end of the year. [6]
The Commissioner determined that a portion of the nondeferred compensation paid in 1973 and 1974 to Willis and Nancy Pethic was unreasonable and excessive, and thus nondeductible by Northern New England, as follows: 1973
1974
Willis Pethic
Nondeferred Compensation
$ 53,811
$ 70,000
Deferred Compensation *
2,492
3,074
Total:
$ 56,303
$ 73,074
Allowed
37,698
45,397
Disallowed (Nondeferred)
$ 18,605
$ 27,677
Nancy Pethic
Salary (Nondeferred
Compensation)
$ 28,860
$ 30,000
Pension Plan Contribution
(Deferred Compensation) *
1,489
1,653
Total
$ 30,349
$ 31,653
Allowed
15,000
15,000
Disallowed (Nondeferred) $ 15,349
$ 16,653
*16 The Commissioner further recomputed Northern New England's charitable contributions deductions for the years at issue to take account of the percentage limitations under section 170(b), I.R.C. 1954, based on taxable income. In the individual petitioners' case, the Commissioner determined that $18,605 of the allegedly unreasonable compensation paid to the Pethics in 1973 was in fact a dividend to them which was ineligible for the benefits of the maximum tax on earned income under section 1348. The parties have agreed that the adjustments described in this paragraph are correct to the extent that the Commissioner's determinations on the reasonable compensation issue are upheld. OPINION Section 162(a), I.R.C. 1954, allows a taxpayer to deduct ordinary and necessary business expenses, including "a reasonable allowance for salaries or other compensation for personal services *17 actually rendered." An amount paid to an employee is deductible pursuant to these provisions only if it is "payment purely for services", "reasonable" in amount, and not a distribution of earnings and profits. Section 1.162-7(a), (b)(1) and (3), Income Tax Regs.; Harolds Club v. Commissioner,340 F. 2d 861, 867 (9th Cir. 1965), affirming a Memorandum Opinion of this Court; Long Island Drug Co. v. Commissioner,111 F. 2d 593, 594 (2nd Cir. 1940), affirming 35 B.T.A. 328 (1937), cert. denied 311 U.S. 680 (1940). The Commissioner determined that the compensation paid in 1973 and 1974 by Northern New England to Willis and Nancy Pethic, both shareholders, officers and directors, was unreasonable, and that a part of the allegedly excessive portion of the compensation constituted a dividend by the corporation. Petitioners bear the burden of proving that the Commissioner's determination was erroneous. Botany Worsted Mills v. United States,278 U.S. 282 (1929); Welch v. Helvering,290 U.S. 111 (1933); *18 Rule 142(a), Tax Court Rules of Practice and Procedure. If petitioners succeed in proving that the Commissioner's determination was erroneous, we must determine on the basis of the record what was reasonable compensation under the particular facts and circumstances of this case. See, e.g., Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 567-568 (1974), affirmed 528 F.2d 176 (10th Cir. 1975). The decided cases in this field and the factual permutations therein are legion. However, the courts have identified certain criteria as especially helpful to the trier of fact. These criteria were set forth concisely in Mayson Mfg. Co. v. Commissioner,178 F. 2d 115, 119 (6th Cir. 1949), reversing a Memorandum Opinion of this Court, where, in language which has on numerous occasions been repeated and adopted by this Court, it was said: Although every case of this kind must stand upon its own facts and circumstances, it is well settled that several basic factors should be considered by the Court in reaching its decision in *19 any particular case. Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * Of course, in cases such as this one, which involve closely-held corporations and intra-family transactions, proper application of those criteria requires most careful scrutiny of all the facts and circumstances. See, e.g., Tulia Feedlot, Inc. v. United States,513 F.2d 800, 805 (5th Cir. 1975) cert. denied, 423 U.S. 947 (1975); Darco Realty Corporation v. Commissioner,301 F.2d 190, 191 (2nd Cir. 1962); Levenson & Klein, Inc. v. Commissioner,67 T.C. 694, 711 (1977). *20 The amount of compensation deductible by a closely held corporation is determined by considering the amount of deferred and nondeferred compensation together. Edwin's, Inc. v. United States,501 F.2d 675, 679 (7th Cir. 1974); cf. Bianchi v. Commissioner,66 T.C. 324, 330 (1976) affd. percuriam553 F.2d 93 (2nd Cir. 1977). Applying these tests, we conclude that the Commissioner erred in making any adjustment in respect of Willis' 1973 salary, but that he must be sustained in part in respect of both Willis' 1974 salary and Nancy's salary for each of the two years. Willis Pethic. We have no doubt that the efforts of Willis Pethic and his experience from having performed tasks in all phases of the business were in large part instrumental in the development and growth of Northern New England. Accordingly, we think that he is entitled to substantial compensation in recognition of his value to Northern New England. Willis' perception that the food locker business was dying was responsible for the family's decision to accept a Rich Plan franchise. Willis, and not his father, exercised the top managerial functions in *21 the business. His qualifications and competence as an executive are evidenced by his selection to serve as director, and later president, of the national Rich Plan Corporation. They are further evidenced by the fact that under Willis Pethic's supervision, Northern New England became one of the most successful franchisees in a difficult business. Northern New England is the second largest Rich Plan dealer based on volume. Sales and profits have increased greatly since the early 1960's during a time of substantial attrition in the ranks of Rich Plan dealers due to business failures. Success where others have failed is evidence of the value of an executive's services. See 4A Mertens, Law of Federal Income Taxation, sec. 25.70, p. 316 and n. 15 (1972 rev.). Further support for the reasonableness of Willis' compensation is found by comparing his salary to sales and income. See Mayson Mfg. Co. v. Commissioner,supra at 119. We note that Willis' salary as a percentage of sales has remained relatively constant since 1965, and has in fact decreased when expressed as *22 a percentage of income before taxes and salaries to Willis and Nancy. [7] This is not a case in which all additions to profits over the years have been siphoned off in the form of excessive salaries. There are, however, certain factors which could be considered as weighing against petitioners' position. The Pethics set their own salaries, and offered no independent evidence or expert testimony to support their judgment of the value of Willis' services, such as evidence of salaries paid for like services by comparable enterprises. This failure of proof, while not fatal, is damaging. Cf. Pepsi Cola Bottling Co. of Salina, Inc. v. Commissioner,supra,61 T.C. at 569; Faucette Co. v. Commissioner,17 T.C. 187, 196 (1951). [8] Also, the corporation's failure to pay dividends despite substantial accumulated earnings during the taxable years is troubling. See, e.g., Dielectric Materials Co. v. Commissioner,57 T.C. 587, 591 (1972); Charles McCandless Tile Service v. United States,422 F. 2d 1336, 1339-1340 (Ct. Cl. 1970). *23 So too, we are disturbed by the practice of setting the shareholder-employee salaries in October of each year when annual profits could be estimated, rather than at the beginning of the year, thus raising a reasonable inference that there may have been an intention to distribute corporate earnings in the guise of salaries. Cf. Ecco High Frequency Corp. v. Commissioner,167 F. 2d 583, 585 (2nd Cir. 1948), cert. denied 335 U.S. 825 (1948). This factor is especially strong with respect to 1974 in the light of the 1975 reclassification of 1974 advances as additional compensation for 1974.
After weighing all the evidence, we are satisfied that a portion of Willis' 1974 compensation was unreasonable, but *24 that his 1973 compensation was reasonable notwithstanding the adverse factors noted above. We conclude that the Commissioner erred in modifying Willis' 1973 compensation, and hereby find as a fact that Willis' total reasonable compensation (including deferred compensation) for 1974 was $65,000. Nancy Pethic. Although we are satisfied on this record that Nancy Pethic received unreasonable compensation during each of the years 1973 and 1974, we think that the Commissioner's adjustments were too drastic. In the early years, Nancy had important full-time executive duties, including acting as credit manager, manager of inventories and deliveries, and as the officer charged with preparing the books and other financial reports. She undoubtedly was undercompensated as a result of the policy of paying her only the amount of baby sitting expenses incurred by the family. We find credible the testimony of Willis Pethic that Nancy's salary after 1970 was partly intended to compensate her for past services rendered. A reasonable amount of compensation for past services rendered is allowable as a deduction in 1973 and 1974. See Lucas v. Ox Fibre Brush Co.,281 U.S. 115, 119 (1930). *25 However, we cannot ignore the fact that Nancy's responsibilities had diminished greatly by 1973 and 1974, both in scope and importance. Other than supervising the bookkeeper, many of her previous regular duties had been assumed by other employees, notably the plant manager. Nancy no longer was required to spend full time at the plant. Her only regular task -- closing the books each month -- was subsequently eliminated when the bookkeeping system was computerized. To be sure, Nancy's experience enabled her to act, and she did perform, as a "jack-of-all-trades" for the business, but it appears that at least some of her time was spent doing tasks, such as meatcutting, ordinarily assigned to much lower paid, nonexecutive personnel. Nancy's executive abilities were underutilized in 1973 and 1974. She nevertheless served in an important capacity in respect of financial planning and together with her husband did play a role in making policy decisions for the business as a whole. It is our best judgment and we hereby find as a fact that her total reasonable compensation (including deferred compensation) for each of the years 1973 and 1974 was $22,000. Decision will be entered under *26 Rule 155.
Footnotes
1. All other adjustments made by the Commissioner that remain unconceded are controlled by our determination of whether the payments at issue constitute deductible compensation for personal services. See page 20, infra.↩
2. Willis Pethic had a high school education prior to entering the partnership business. The educational background of Nancy Pethic is not disclosed in the record.↩
3. There were as many as 200 Rich Plan franchisees in operation in the early 1960's. After a series of business failures, the number of active franchisees dwindled to 30 or 35, including petitioner Northern New England, during the years at issue. Northern New England assumed its present name after its territorial expansion.↩
4. During 1973, Willis Pethic made a gift of 20 of his shares in Northern New England to Nancy Pethic.↩
5. After the bookkeeping system was computerized, Nancy's job closing the books each month was eliminated.↩
*. Salary determined by use of base salary plus commissions from new Sales.↩
*. (Table 2, Column 4) divided by (Table 1, Column 2). ** (Table 2, Column 4) divided by (Table 1, Column 3 + Table 2, Column 4 + Table 2, Column 5). *** (Table 2, Column 5) divided by (Table 1, Column 2). **** (Table 2, Column 5) divided by (Table 1, Column 3 + Table 2, Column 4, + Table 2, Column 5).↩
6. The Commissioner has conceded that this sum, if reasonable in amount, was paid and is properly deductible in 1974.↩
*. There is no dispute that such amounts were paid and deducted by Northern New England as nondeferred compensation to Willis and Nancy Pethic during the years at issue.↩
7. In 1973 and 1974, both of these measures of Willis' compensation were lower than in any year since 1965. See Table III, supra.↩
8. We were unconvinced by petitioners' contention that the business of Northern New England was so unique that no such comparisons could be helpful. Salary data from other Rich Plan franchisees might have been relevant evidence, and no reason was offered why such data could not have been obtained. In this regard, we note Willis' close connection with the national Rich Plan Corporation which was engaged in servicing each of the Rich Plan franchisees.↩