T.C. Memo. 2003-239


UNITED STATES TAX COURT


E.J. HARRISON AND SONS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5316-01.                    Filed August 13, 2003.


        P was engaged in the waste pickup and disposal
business, servicing several California communities.
During the years in question, H was one of four
officers of P, the other three being her sons, who were
responsible for all of the key management functions on
P's behalf.  R disallowed a portion of P's deduction
for compensation paid to H on the ground that it was
unreasonable and excessive.

        <u>Held</u>:  Reasonable compensation for H determined.
See sec. 162(a), I.R.C.


<u>Philip Garrett Panitz</u>, for petitioner.

<u>Ryan D. Schaap</u> (specially recognized), for petitioner.

<u>Jonathan H. Sloat</u> and <u>Linette B. Angelastro</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  By notice of deficiency dated February 2, 2001 (the notice), respondent determined deficiencies in petitioner's Federal income tax as follows:

| TYE 6/30 | Deficiency |
| --- | --- |
| 1995 | $161,680 |
| 1996 | 152,933 |
| 1997 | 61,628 |

The adjustments giving rise to those deficiencies are respondent's disallowance of a portion of the deduction petitioner claimed in each of the foregoing taxable years (the audit years) for amounts paid to Myra I. Harrison (Mrs. Harrison), one of petitioner's officer-shareholders, as compensation for services.  The amounts disallowed (disallowed amounts) are $808,041, $764,664, and $541,325 for petitioner's 1995, 1996, and 1997 audit years, respectively.  On brief, respondent concedes a small portion of each of the disallowed amounts for petitioner's 1995 and 1996 audit years, so that they are reduced to $806,467 and $762,019, respectively.  We accept those concessions.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All dollar amounts have been rounded to the nearest dollar.

FINDINGS OF FACT

Some facts have been stipulated and are so found.  The stipulation of facts, with attached exhibits, is incorporated herein by this reference.

Petitioner's Business Operations

Elmo J. Harrison (Mr. Harrison) and Mrs. Harrison entered into the trash or waste pickup and disposal (trash hauling) business (sometimes, the business) in 1932.  They incorporated the business (i.e., petitioner) in the State of California in 1967.  At the time it filed its petition, petitioner's principal place of business was in the State of California.  During the audit years, petitioner performed its trash hauling services pursuant to contracts with various municipalities in Ventura and Santa Barbara Counties in the State of California.  Those contracts provided to petitioner the exclusive right or franchise to pick up and dispose of residential and commercial waste. Under the contracts, petitioner was permitted to charge a per-barrel or per-bin trash hauling rate as set by the municipality from time to time.  Some contracts also provided a "management fee" based upon petitioner's cost of performance.  In consideration of the grant of the franchise, petitioner was typically charged a "franchise fee" by the customer equal to a specified percentage (e.g., 5 percent) of its gross receipts under the contract.  The municipalities with which petitioner had

contracts during the audit years included the cities of Carpenteria, Ventura, Camarillo, and Ojai. Petitioner also contracted with Ventura County, covering the unincorporated portions of that county.

Board of Directors Meetings

On July 15, 1991, shortly after Mr. Harrison's death on April 5, 1991, petitioner's board of directors (the board) elected Mrs. Harrison president of petitioner, a title she held continuously through the audit years. Petitioner's other officers during the 1991-97 period were the Harrisons' three sons, Ralph E. Harrison (Ralph), James E. Harrison (James), and Myron G. Harrison (Myron), each of whom held the title "vice president". Ralph also held the title "secretary and treasurer". After Mr. Harrison's death, those four individuals constituted the board. The formal board meetings (for which typewritten minutes were kept) were held annually on July 15 during the 1991-97 period. Mrs. Harrison acted as or was designated "chairman" of the meeting and Ralph acted as or was designated "secretary". During the 1995-97 annual meetings, the board determined "the annual compensation, including bonuses, of each of the * * * [officers]" for the fiscal year ending the previous June 30;

i.e., for each of the audit years.[1]  The members of the board also met informally each week to discuss company business.

Under petitioner's bylaws, each director has an equal vote; no director has veto power over a decision by a majority of the board.  Nevertheless, in practice, with respect to major decisions (e.g., approval of trash hauling contracts, major equipment purchases, or large borrowings), the board acted by consensus; i.e., unanimous agreement.

## Duties of Officers

### Mrs. Harrison

In the early years of the business, Mrs. Harrison kept petitioner's financial books and maintained the "route books", which determined the routes for the trash pickup trucks.  Her duties consisted primarily of keeping track of customers, collecting payments, and depositing collections.  After her three sons joined the business in the early 1960s, Mrs. Harrison continued to keep "the books", basically keeping track of payments and collections.  She also paid certain of the bills and attended contract negotiation meetings with Mr. Harrison.

---

[1]  We note that petitioner, an accrual basis taxpayer, would appear to be prohibited from deducting, in any taxable year, compensation that is not fixed or determinable until after the close of that taxable year.  See sec. 1.461-1(a)(2), Income Tax Regs.  Because respondent has not raised, as an issue, the proper accrual of officer compensation, we do not address it.

During the audit years, Mrs. Harrison's principal activities consisted of (1) attending board meetings and voting on major proposals put forward by her sons, who were responsible for the day to day operations of petitioner, (2) engaging in extensive public relations activities on behalf of petitioner, and (3) acting as a coguarantor (together with her sons) of bank loans to petitioner for major capital equipment purchases.

At board meetings during the audit years, Mrs. Harrison uniformly concurred in the proposals put forward by her sons, e.g., proposed trash hauling contracts or equipment purchases. On only one occasion before those years (in the mid-1960s) did Mrs. Harrison "veto" a decision (to purchase new trucks) that had been agreed to by the other directors.

For the most part, her public relations activities consisted of representing petitioner at civic events, such as meetings of seven chambers of commerce for municipalities where petitioner did business, Boy Scout functions, Ventura County Boys and Girls Club functions, and the Ventura Chamber Music Festival. Typically, the Harrison family would purchase one or two tables at community events. They would attend en masse with Mrs. Harrison always at the head table.

Although she approved petitioner's trash hauling contracts as a member of the board of directors, she did not take part in the negotiation of those contracts, nor did she communicate with

employees of the cities with regard to the implementation of those contracts.

During the audit years, Mrs. Harrison was in her office at one of petitioner's facilities (and, after April 1997, at the facilities of a related corporation) an average of two to three times per week. On occasion, she also took work home. Her work consisted in part of filing and maintaining historic company records. She also looked over proposed trash hauling contracts before signature, and she reviewed bills and signed checks prepared by others in payment of those bills. She was the only officer with authority to sign checks without a countersignature. On occasion, she attended meetings arranged by one or more of her sons with drivers or other employees where her fluency in Spanish was of use. In addition, she met with bankers in connection with her loan guaranties. Her attendance at those meetings usually occurred after the loan terms had been negotiated but before the final decision to go ahead with the loan. Including her public relations activities, Mrs. Harrison worked 40 or more hours per week on petitioner's behalf.

Mrs. Harrison was 79, 80, and 81 years old during the audit years.

### Myron Harrison

Myron joined the business in 1959 and has been employed continuously by petitioner since its incorporation. Before and

during the audit years, Myron was in charge of financing petitioner's operations, including vehicle financing. He was also in charge of billings and collections. Myron exercised sole responsibility for the purchase of office equipment, although Mrs. Harrison would be consulted regarding major purchases, such as a new computer system for the office. The company controller reported to Myron. In addition, during the audit years, Myron was involved in the negotiation of trash hauling contracts with petitioner's customers.

Myron was also involved in community affairs. He was on the board of directors of the Boys and Girls Club of Ventura and of a local theater company.

James Harrison

James joined the business in 1962 and, like Myron, has been employed continuously by petitioner since its incorporation. Before and during the audit years he was responsible for operations and contracts. In that capacity, he was in charge of negotiating the trash hauling contracts with the various cities, and he represented petitioner at city council meetings. He also had primary responsibility for the design and planning of trash pickup routes and for trash barrel and bin management. He often worked as many as 70 hours per week.

Ralph Harrison

Ralph also joined the business in 1962 and, like his brothers, has been employed continuously by petitioner since its incorporation.  Before and during the audit years his principal responsibility was to manage, maintain, and refurbish petitioner's fleet of trash pickup trucks.  He was also responsible for all major equipment purchases, including trucks, containers, and heavy equipment such as tractors and bulldozers.

Related Entities

During the audit years, Mrs. Harrison and her sons were involved in the trash hauling business through entities other than petitioner.  They were the sole partners in three partnerships:  E.J. Harrison & Sons Rentals (Rentals), Newbury Disposal Co. (Newbury), and Santa Clara Valley Disposal (Valley).  Mrs. Harrison was employed by Newbury and Valley, but she received no compensation other than by means of partnership distributions.  In addition, Myron, James, and Ralph were the sole shareholders in Gold Coast Recycling, Inc., which was formed in 1990 to operate a recycling facility in Ventura County.  Mr. and Mrs. Harrison declined to take any interest in Gold Coast Recycling, Inc., as they did not want to be involved in the recycling business.  Mrs. Harrison had no involvement with Gold Coast Recycling, Inc., during the audit years.

Well before the audit years, the family formed Rentals, which purchased trucks from petitioner. Since that time, petitioner has leased most of its trash hauling trucks from Rentals. During the audit years, Rentals was owned 55 percent by Mrs. Harrison and 15 percent each by Myron, James, and Ralph.

Loan Guaranties

Before the audit years, the California legislature passed a recycling law (known as AB 939) that required California cities to recycle 50 percent of their waste, all of which had previously been dumped into landfills. In order to comply with AB 939, petitioner was required to supply each of its individual customers with three barrels instead of one: A trash barrel, a recycle barrel, and a green waste container for lawn or grass trimmings. In order to raise the cash needed to purchase the additional barrels and related equipment, petitioner and Rentals arranged for loans from Bank of America. On June 1, 1992, and on May 3, 1996, Bank of America, as lender, and petitioner and Rentals, as borrowers, entered into business loan agreements (loan 1 and loan 2, respectively). Loan 1 provided a $1.5 million line of credit secured by the personal property financed by the loan and was conditioned, in part, on the execution of guaranties by Mrs. Harrison, Myron, James, and Ralph, each in the sum of $1.5 million. Pursuant to amendments to loan 1 dated August 14, 1992, and June 13, 1994, the line of credit was

increased to $5,350,000. On June 13, 1994, Mrs. Harrison, Myron, and Ralph, and, on June 14, 1994, James separately executed continuing guaranties of "any and all indebtedness" of petitioner and Rentals to Bank of America up to the sum of $7.5 million. Loan 2 increased the overall line of credit from Bank of America to petitioner and Rentals to approximately $7 million.

On August 25, 1995, Mrs. Harrison, Myron, Ralph, and James jointly and severally guaranteed the obligations of petitioner and Rentals as lessees under a truck lease with an independent third party, BA Leasing & Capital Corp., as lessor. A corporate resolution executed on the same date by Myron and Ralph on behalf of petitioner limited the aggregate cost of the trucks subject to the lease to $1 million.

After the audit years, on April 14, 1998, Mrs. Harrison, as trustee of the Survivor's Trust, created under the E.J. Harrison Family Trust, and James and Mary Harrison, as trustees of the James E. Harrison Family Trust, executed a continuing guaranty in favor of Bank of America securing a line of credit to petitioner and Rentals in the sum of $16 million. That guaranty replaced the earlier, lesser guaranties executed during the audit years.

During the audit years, petitioner used the line of credit from Bank of America to place in service equipment costing in excess of $3.6 million. Petitioner has never defaulted on any of

the loans made to it by Bank of America, nor has there ever been any threat of default.

Compensation of Officers by Petitioner

Petitioner's officers received compensation in the following amounts for petitioner's taxable years ending June 30, 1979 through 1997:

| TYE 6/30 | Mr. Harrison | Mrs. Harrison | Myron | James | Ralph | Total Officer Compensation |
|---|---|---|---|---|---|---|
| 1979 | (no breakdown – data not in evidence) | | | | | $353,850 |
| 1980 | $87,109 | $74,990 | $61,335 | $61,360 | $61,360 | 346,154 |
| 1981 | 120,358 | 100,955 | 94,466 | 93,584 | 88,481 | 497,844 |
| 1982 | 164,075 | 151,335 | 108,310 | 108,310 | 108,310 | 640,340 |
| 1983 | 224,025 | 211,285 | 141,010 | 141,010 | 141,010 | 858,340 |
| 1984 | 182,900 | 169,915 | 118,940 | 118,940 | 118,940 | 709,635 |
| 1985 | 243,367 | 230,626 | 151,560 | 151,560 | 151,560 | 928,673 |
| 1986 | 297,450 | 284,710 | 181,060 | 181,060 | 181,060 | 1,125,340 |
| 1987 | 384,846 | 372,106 | 239,840 | 239,840 | 239,840 | 1,476,472 |
| 1988 | 279,383 | 265,721 | 184,379 | 184,379 | 184,379 | 1,098,241 |
| 1989 | (no breakdown – data not in evidence) | | | | | 1,161,150 |
| 1990 | 421,951 | 354,305 | 240,498 | 240,498 | 240,498 | 1,497,750 |
| 1991 | 125,697 | 351,084 | 154,792 | 154,792 | 154,792 | 941,157 |
| 1992 | – | 419,394 | 165,371 | 166,218 | 166,217 | 917,200 |
| 1993 | – | 174,585 | 132,425 | 132,425 | 132,425 | 571,860 |
| 1994 | – | 431,482 | 262,607 | 262,607 | 262,607 | 1,219,303 |
| 1995 | – | 860,682 | 479,773 | 473,973 | 459,673 | 2,274,101 |
| 1996 | – | 818,059 | 442,882 | 475,183 | 468,188 | 2,204,312 |
| 1997 | – | 600,059 | 338,436 | 377,849 | 360,391 | 1,676,735 |

Petitioner's Financial Results

For the same taxable years, according to its returns as filed, petitioner's sales, after-tax income (net income), yearend stockholder equity (equity), yearend assets (assets), return on sales (ROS), return on yearend equity (ROE), and return on yearend assets (ROA) were as follows:

| TYE 6/30 | Sales $000 | Net income $000 | Equity $000 | Assets $000 | ROS percent | ROE percent | ROA percent |
|---|---|---|---|---|---|---|---|
| 1979 | $3,200 | $106 | $348 | $1,010 | 3.3 | 30.5 | 10.4 |

| 1980 | 3,819 | 82 | 433 | 955 | 2.1 | 18.9 | 8.6 |
|---|---|---|---|---|---|---|---|
| 1981 | 4,502 | 124 | 556 | 1,058 | 2.8 | 22.3 | 11.7 |
| 1982 | 5,372 | 197 | 753 | 1,167 | 3.7 | 26.2 | 16.9 |
| 1983 | 5,522 | 25 | 778 | 1,214 | .5 | 3.2 | 2.1 |
| 1984 | 6,234 | (95) | 683 | 1,082 | (1.5) | (13.9) | (8.8) |
| 1985 | 6,070 | (92) | (data not in evidence) | 1,085 | (1.5) | -- | (8.5) |
| 1986 | 7,666 | 35 | 757 | 1,217 | .5 | 4.6 | 2.9 |
| 1987 | 8,884 | (38) | 769 | 1,130 | (.4) | (4.9) | (3.4) |
| 1988 | 9,760 | 106 | 1,276 | 2,049 | 1.1 | 8.3 | 5.2 |
| 1989 | 11,328 | 89 | 1,229 | 2,503 | .8 | 7.2 | 3.6 |
| 1990 | 14,011 | 82 | 1,183 | 2,805 | .6 | 6.9 | 2.9 |
| 1991 | 15,662 | (59) | 827 | 3,743 | (.4) | (7.1) | (1.6) |
| 1992 | 16,817 | (217) | 256 | 3,672 | (1.3) | (84.8) | (5.9) |
| 1993 | 18,366 | (16) | 251 | 4,490 | (.1) | (6.4) | (.4) |
| 1994 | 23,604 | 356 | 450 | 6,444 | 1.5 | 79.1 | 5.5 |
| 1995 | 27,409 | 302 | 1,027 | 7,505 | 1.1 | 29.4 | 4.0 |
| 1996 | 26,826 | 155 | 1,451 | 8,279 | .6 | 10.7 | 1.9 |
| 1997 | 26,288 | (233) | 1,296 | 7,326 | (.9) | (18.0) | (3.2) |

Pursuant to the foregoing figures, the average ROS, ROE and ROA for the audit years were as follows:

| | |
|---|---|
| ROS | .27% |
| ROE | 7.4% |
| ROA | .9% |

## Officers' Ownership of Petitioner's Stock

During the 1980-97 taxable years, Mr. and Mrs. Harrison, Myron, James, and Ralph owned all of petitioner's stock in the following percentage amounts:

| | TYE June 30 | | |
|---|---|---|---|
| | 1980-90 | 1991-94 | 1995-97 |
| Mr. Harrison | 28 | – | -- |
| Mrs. Harrison | 27 | [1]55 | 46 |
| Myron | 15 | 15 | 18 |
| James | 15 | 15 | 18 |
| Ralph | 15 | 15 | 18 |

[1] The return for the taxable year ending June 30, 1991, lists Mrs. Harrison as owning a 54-percent interest. We assume that that entry is mistaken and that she actually owned a 55-percent interest in petitioner.

Dividend History

Petitioner has never paid a dividend.

OPINION

I. Burden of Proof

   A. Rule 142(a)

In pertinent part, Rule 142(a)(1) provides the general rule that "[t]he burden of proof shall be upon the petitioner". Rule 142(a)(2) references the applicability of section 7491, which shifts the burden of proof to the Secretary under certain specified circumstances.

   B. Section 7491

Section 7491, enacted as part of the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA 1998), Pub. L. 105-206, sec. 3001, 112 Stat. 727, is applicable to "court proceedings arising in connection with examinations commencing after the date of the enactment of this Act." RRA 1998 sec. 3001(c). RRA 1998 was enacted on July 22, 1998, well before respondent's issuance of the notice on February 2, 2001. The record fails to indicate, however, the commencement date of respondent's examination of petitioner. Moreover, petitioner has neither argued that section 7491 is applicable to shift the burden of proof to respondent nor established compliance with the requirements of section 7491(a)(2)(C) (the net worth limitation). Petitioner has the burden to prove that it satisfies the

requirements of that provision as one of the prerequisites to establishing that the burden of proof is on respondent. See Edwards v. Commissioner, T.C. Memo. 2002-169; Cipriano v. Commissioner, T.C. Memo. 2001-157, affd. 55 Fed. Appx. 104 (3d Cir. 2003).

C. Conclusion

Because petitioner has failed to establish that it meets the conditions for the applicability of section 7491, petitioner bears the burden of proof. Rule 142(a).

II. Deductibility of Payments to Mrs. Harrison

A. Section 162(a)(1)

This case requires that we decide whether pursuant to section 162(a)(1) petitioner can deduct amounts it paid to Mrs. Harrison during the audit years. That section provides:

SEC. 162. TRADE OR BUSINESS EXPENSES

(a) In general.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including--

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

Section 162(a)(1) establishes a two-pronged test for the deductibility of amounts purportedly paid as salaries or other compensation for personal services actually rendered (without distinction, compensation for services): The payments must be (1) "reasonable", and (2) "in fact payments purely for services".

Sec. 1.162-7(a), Income Tax Regs.; see also <u>Nor-Cal Adjusters v.</u>
<u>Commissioner</u>, 503 F.2d 359, 362 (9th Cir. 1974), affg. T.C. Memo.
1971-200.

B. <u>Positions of the Parties</u>

Respondent argues that petitioner's deductions for
compensation paid to Mrs. Harrison during the audit years should
be reduced as follows:

| TYE 6/30 | Amount deducted | Amount allowed | Amount disallowed |
|----------|-----------------|----------------|-------------------|
| 1995 | $860,682 | $54,215 | $806,467 |
| 1996 | 818,059 | 56,040 | 762,019 |
| 1997 | 600,059 | 58,734 | 541,325 |

Respondent argues that the disallowed amounts are "unreasonable
and excessive compensation". Respondent considers Mrs.
Harrison's services equivalent to those provided by an outsider
serving as chair of a corporation's board of directors, and the
amounts respondent allowed as reasonable compensation for the
audit years reflect respondent's concession as to the amounts
properly attributable to those services. Respondent also argues
that the disallowed amounts were intended to be disguised
dividends to Mrs. Harrison rather than payments for services
rendered.[2]

_____

[2] Respondent's "disguised dividend" argument is raised for
the first time on brief. Petitioner has not argued that the
introduction of that argument on brief constitutes the raising of
a "new matter" requiring respondent to bear the burden of proof
with respect to that matter. See Rule 142(a). Had petitioner
made that argument, we would have rejected it for the reasons set
(continued...)

Petitioner argues that, during the audit years, Mrs. Harrison provided significant services to petitioner consisting principally of (1) her services as a member of petitioner's board of directors, (2) her public relations activities, i.e., her activities as petitioner's primary representative at numerous charitable and civic events in the communities served by petitioner, and (3) her personal guaranty of the line of credit to petitioner from Bank of America. Petitioner also argues that its return on equity during the audit years would have satisfied an independent investor in petitioner. On that basis, petitioner argues that it is entitled to deduct the entire amount paid to Mrs. Harrison during the audit years as reasonable compensation for services rendered.

C. Analysis

1. Applicable Caselaw

Because petitioner's principal place of business is in California, it is likely that any appeal of this case would be to the Court of Appeals for the Ninth Circuit. See sec. 7482(b)(1)(B). Therefore, we must apply that court's jurisprudence governing issues of reasonable compensation in accordance with the doctrine of Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

---

[2](...continued)
forth in Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 361-362 (9th Cir. 1974), affg. T.C. Memo. 1971-200.

The jurisprudence of the Court of Appeals for the Ninth Circuit is set forth in Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1244-1245 (9th Cir. 1983), revg. T.C. Memo. 1980-282, wherein it adopts and applies the two-pronged test set forth in the regulations as follows:

> In determining the deductibility of compensation payments paid to shareholder-employees, we will continue to concentrate on the reasonableness of those payments. In the rare case where there is evidence that an otherwise reasonable compensation payment contains a disguised dividend, the inquiry may expand into compensatory intent apart from reasonableness. * * * The inquiry into reasonableness is a broad one and will, in effect, subsume the inquiry into compensatory intent in most cases.

> In evaluating the reasonableness of compensation paid to a shareholder-employee * * * it is helpful to consider the matter from the perspective of a hypothetical independent investor. A relevant inquiry is whether an inactive, independent investor would be willing to compensate the employee as he was compensated. The nature and quality of the services should be considered, as well as the effect of those services on the return the investor is seeing on his investment. * * *

In considering the reasonableness of compensation "from the perspective of a hypothetical independent investor", the Court of Appeals for the Ninth Circuit in Elliotts, Inc. applies a five-factor test: (1) The employee's role in the company; (2) a comparison of the compensation paid to the employee with the compensation paid to similarly situated employees in similar companies (external comparison); (3) the character and condition of the company; (4) whether a conflict of interest exists that might permit the company to disguise dividend payments as

deductible compensation; and (5) whether the compensation was paid pursuant to a structured, formal and consistently applied program.  Id. at 1245-1248; see also LabelGraphics, Inc. v. Commissioner, T.C. Memo. 1998-343, affd. 221 F.3d 1091 (9th Cir. 2000) (the Elliotts, Inc. factors).

### 2.  Need To Apply the Elliotts, Inc. Factors

In this case, respondent's conclusion that petitioner's purported compensation payments to Mrs. Harrison constituted disguised dividends to the extent of the disallowed amounts is based, in large part, upon his conclusion that total payments were well in excess of the amounts that may be considered reasonable compensation for the services Mrs. Harrison performed on petitioner's behalf.  Therefore, we must determine reasonableness in terms of the Elliotts, Inc. factors.

### 3.  Expert Reports

### a.  Introduction

Both parties offered expert testimony in support of their respective positions.

In deciding the reasonableness of compensation, courts often look to the opinions of expert witnesses.  Nonetheless, we are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of sound judgment. Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990).  Although we may accept the opinion of an expert in its entirety, see

<u>Buffalo Tool & Die Manufacturing Co. v. Commissioner</u>, 74 T.C. 441, 452 (1980), we may be selective in determining what portions of an expert's opinion, if any, to accept, <u>Parker v. Commissioner</u>, 86 T.C. 547, 562 (1986).

      b.  <u>Petitioner's Expert</u>

Petitioner's expert, David Ostrove (Mr. Ostrove), is an attorney and C.P.A. He has been engaged as an expert witness on numerous occasions, including cases involving reasonable compensation issues. Approximately one-third of Mr. Ostrove's report was voluntarily redacted by petitioner's counsel because it comprised legal analysis and argument, including citations and discussion of caselaw and of a published revenue ruling. The balance of the report consists of Mr. Ostrove's analysis of (1) petitioner's return on equity (ROE) for the 1979-84, 1986-90, and 1994-97 tax years and (2) the reasonableness of Mrs. Harrison's compensation in terms of his application of the <u>Elliotts, Inc.</u> factors.

Mr. Ostrove acknowledged during the voir dire that he had no formal training in conducting compensation surveys; comparing or evaluating types or components of compensation; corporate finance; or valuation appraisal. Moreover, in response to a hypothetical question by the Court, he admitted that he lacked the expertise necessary to advise a corporate client as to the appropriate salary to offer candidates for director of a new division.

Respondent objects to the admissibility of Mr. Ostrove's report on the ground that Mr. Ostrove is not an expert with respect to compensation matters.  Alternatively, respondent argues that, if admitted into evidence, Mr. Ostrove's report should be given no weight.  In light of Mr. Ostrove's obvious lack of training or experience in the field of executive compensation, we are inclined to agree with respondent that Mr. Ostrove's report is inadmissible because it is not the testimony of an "expert" within the meaning of rule 702 of the Federal Rules of Evidence.[3]  We find it unnecessary, however, to so rule because we find the report to be inadmissible on the ground that it was not "based upon sufficient facts or data", and on the further ground that Mr. Ostrove did not apply "principles and methods [for determining the reasonableness of Mrs. Harrison's compensation] reliably to the facts of the case" as required by rule 702 of the Federal Rules of Evidence.

---

[3]  Fed. R. Evid. 702 provides:

Rule 702.  Testimony by Experts

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Virtually all of Mr. Ostrove's factual conclusions upon which he bases his opinion are either unsupported or in error, as follows.

Mr. Ostrove's computation of petitioner's ROE for the 1979-84, 1986-90, and 1994-97 taxable years is based upon the ratio of taxable (pretax) income to equity, which contradicts principles of corporate finance that require the use of after-tax income in such computations. See Adams et al., Fundamentals of Business Valuation (Part I) 4-21 (2000); Brealey & Myers, Principles of Corporate Finance 828, 830 (7th ed. 2003). We have used after-tax income in computing ROE. See B & D Founds., Inc. v. Commissioner, T.C. Memo. 2001-262 (n.2 to table listing annual ROE); LabelGraphics, Inc. v. Commissioner, supra (n.2 to table listing annual ROE).

Mr. Ostrove observes that "it cannot be denied that [Mrs. Harrison] is a highly qualified business person and is largely responsible for the noteworthy success of her company." As discussed infra section II.C.4., it is clear from the trial testimony that Mrs. Harrison has always played a secondary role in the operation of petitioner's trash hauling business and that the primary roles were played, first, by Mr. Harrison and, later, by Myron, James, and Ralph.

Mr. Ostrove also states that "Mrs. Harrison (and her deceased husband) assumed not only the plethora of risks associated with founding and developing a successful business

concern, but she also incurred a substantial economic opportunity cost, by sticking with this business for all of these years." That statement appears in the portion of Mr. Ostrove's report dealing with the independent investor test, and we assume that he is referring to the investment return from some alternative investment that Mrs. Harrison gave up (her "opportunity cost") when she decided to invest in (and stick with) petitioner. In corporate finance, the term "opportunity cost" is generally used to refer to financial investments (and not employment status). See, e.g., Brealey & Myers, supra at 15 (defining "opportunity cost" as "the return foregone by investing in * * * [a] project rather than investing in securities").

Mr. Ostrove states that "Mrs. Harrison's compensation for * * * [the audit years] did not exceed the amount needed to remedy prior years of undercompensation, and was therefore reasonable." The only evidence of undercompensation is Mrs. Harrison's testimony that, for a year or so, when James and Ralph joined the business in 1962, nobody received wages "because we needed that money to grow." Assuming arguendo that petitioner absorbed the entire preincorporation business and took title to all of the assets of that business, thereby becoming eligible to deduct payments intended to compensate Mrs. Harrison for services performed in a preincorporation taxable year, see Young v. Commissioner, 650 F.2d 1083, 1085 (9th Cir. 1981), affg. T.C. Memo. 1979-242; R.J. Nicoll Co. v. Commissioner, 59 T.C. 37, 50-

52 (1972), Mr. Ostrove has failed to offer any evidence of intent on the part of petitioner's officers and directors to compensate Mrs. Harrison for such prior services, see Pac. Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7; R.J. Nicoll Co. v. Commissioner, supra at 52. Nor has he offered evidence as to the amount of any prior years' undercompensation or shown that it has not been more than offset by payments to Mrs. Harrison for taxable years before the audit years. At least since 1979, Mrs. Harrison's compensation has annually exceeded that of her sons, each of whom has exercised greater management responsibility on petitioner's behalf than she. Thus, any earlier undercompensation of Mrs. Harrison was most likely remedied before the audit years. See LabelGraphics, Inc. v. Commissioner, 221 F.3d at 1096-1097; B & D Founds., Inc. v. Commissioner, supra. It is also noteworthy that the briefs filed on petitioner's behalf make no attempt to defend the reasonableness of Mrs. Harrison's compensation during the audit years on the basis of prior years' undercompensation.

Mr. Ostrove states that "Mrs. Harrison negotiates and brings in the contracts." That conclusion is directly contrary to the parties' stipulation at trial that "[f]rom 1989 through the years in issue, Mrs. Harrison did not represent the petitioner in negotiation of any contracts between petitioner and the cities, nor did she communicate with employees of the cities with regard to the implementation of the contracts."

In short, Mr. Ostrove's report at times fails to set forth "the facts or data on which * * * [his] opinion is based", in violation of Rule 143(f), and, at other times, his factual conclusions are either belied by the record or not germane to the issue of reasonable compensation. Thus, the report fails to satisfy the requirements of rule 702 of the Federal Rules of Evidence and is, therefore, inadmissible.

### c. Respondent's Expert

Respondent's expert, James F. Carey (Mr. Carey), is a self-employed certified management consultant specializing in compensation planning. He has been an expert witness in State and Federal courts, and he has testified on compensation-related matters. The Court accepted Mr. Carey as an expert in compensation planning, which, for purposes of this case, includes the setting of compensation for a particular individual. Mr. Carey's written report was received into evidence as his direct and rebuttal testimony.

We will consider the merits of Mr. Carey's analysis and conclusions, largely relied upon by respondent, in connection with our application of the Elliotts, Inc. factors.

### 4. Application of the Elliotts, Inc. Factors

### a. Mrs. Harrison's Role in the Company

The relevant considerations in applying this factor include the employee's position, hours worked, and duties performed. Elliotts, Inc. v. Commissioner, 716 F.2d at 1245. Mrs. Harrison

testified that, during the audit years, she worked more than 40 hours per week on behalf of petitioner.  Her principal involvement with petitioner consisted of:  (1) Attending weekly board meetings; (2) attending, as a representative of petitioner, chamber of commerce meetings and various community functions and events in the cities served by petitioner; and (3) executing her personal guaranty relating to the line of credit extended to petitioner by Bank of America.  Mrs. Harrison's other activities, such as filing and maintaining historic company records, signing checks presented to her for the payment of bills, and attending occasional meetings with drivers or other rank and file employees, were either ministerial in nature or so sporadic as to justify no more than a small fraction of the payments to her during the audit years.  We will consider each of her three principal functions in turn.

(1)  Weekly Board Meetings

The weekly board meeting discussions covered matters of importance in the conduct of petitioner's business, and they often culminated in a board vote on whether to go ahead with a proposed transaction.  Although Mrs. Harrison, her three sons, and other witnesses all characterized Mrs. Harrison as the final arbiter of all major business decisions, it is clear that, under petitioner's bylaws, she was one of four members of the board, each of whom had an equal vote.  Thus, Mrs. Harrison possessed no power to veto a decision agreed to by her sons.  What the

seemingly contradictory testimony indicates, however, is that Mrs. Harrison's sons, whether out of filial respect for their mother, respect for her many years of involvement with petitioner, or both, voluntarily chose to operate petitioner by consensus.

We suspect that the decision to operate the board by consensus was reached principally out of respect for Mrs. Harrison's conservative approach to proposals for major expenditures, which, to some extent, carried over to her sons. For example, Myron testified as follows:

> Q. What type of purchasing decisions would she disapprove of?
>
> A. Buying too many new trucks, or too many trucks period. She didn't like to spend a whole lot of money; she was very tight with the money, so she didn't like to purchase new trucks. We have the ability to refurbish old equipment, and that's what she would prefer to see us do.
>
> Q. And so sometimes you wouldn't purchase these trucks, and just go the refurbishing route?
>
> A. Exactly; more often than not.

James also testified as to the continuing influence of his mother's conservative approach to purchasing new trucks:

> Q. * * * were you the one responsible for deciding what trucks to purchase for the company?
>
> A. Yeah. Usually we're a very conservative company, so usually we would get pretty tight on our trucking before we would consider buying some additional trucks * * *.

Whatever lingering effect Mrs. Harrison's conservative business philosophy may have had on the decisionmaking process, it appears that her responsibility for and influence over the actual decisions of the board were sharply limited in practice. Mrs. Harrison acknowledged that, shortly after her sons joined the business, they became the "supervisors of the company", and she and Mr. Harrison became primarily responsible for paying bills, keeping track of collections, and keeping the books. She further acknowledged that major decisions requiring board approval (such as approval of trash hauling contracts or truck or other equipment purchases) had been "pretty well thought out" by her sons so that, with the exception of one proposed purchase of trucks in the mid-1960s, she never dissented. Even when she initially had doubts concerning a proposal of one of her sons, her sons were able to win her over to their position. Myron testified that, in connection with the guaranteed loans, Mrs. Harrison attended meetings with the Bank of America that were held "after most of the decisions were made, for the final decision".

The overall picture that emerges is of a company run during the audit years (and for many prior years) by Mrs. Harrison's sons, each of whom was responsible for managing a key operational function (Myron, finance; James, general operations and contracts; Ralph, equipment purchasing, maintenance, and refurbishment) and for the development of all major business

proposals in his management area. During that same period, Mrs. Harrison's role as a member of the board was limited to the review and, in all cases, approval of proposals developed by her sons. She had neither the power (under petitioner's bylaws) nor the inclination to challenge their decisions. Under the circumstances, we believe that her titles of president and chairman of the board were titular and not reflective of her actual status within the company. We find that her role as an essentially compliant member of petitioner's board justified her receipt of only a small fraction of the compensation paid to her during the audit years.

(2)  Public Relations Activities

The benefit to petitioner of Mrs. Harrison's public relations activities depends upon the contribution of those activities to petitioner's ability to secure trash hauling contracts.

Two of Mrs. Harrison's sons testified as to the importance to petitioner of those activities. Myron referred to his mother as petitioner's "ambassador of good will", known and appreciated by "everybody" including city councilors, mayors, and county supervisors for the jurisdictions in which petitioner conducted business. James speculated that her lifetime spent in Ventura County and her involvement in that community led to business. Stan Whisenhunt, the owner of a Ventura County public relations and marketing company who had published newsletters for

petitioner and was in the process of publishing Mrs. Harrison's biography, also stressed the importance of petitioner's excellent reputation to its ability to win contracts.

In contrast, a member of the Ventura City Council, part of whose job it was to approve trash hauling contracts, testified that petitioner was awarded contracts because of its "excellent record", the honesty of its "operating people", and its performance on behalf of the city and because "they have the equipment and the personnel to do the work." He noted that trash hauling contracts are awarded to "the most qualified bidder", not necessarily the lowest bidder, as both price and profit rates are set by the City Council in advance. For that reason, eligible bidders are prequalified, and the one considered best able to do the work is selected by the City Council. He testified that, in years past, at least two trash hauling contracts had been awarded to companies other than petitioner. Similarly, a member of the Camarillo City Council, involved for many years in the negotiation and approval of trash hauling contracts on behalf of the city, testified that such contracts had been awarded to petitioner "[b]ecause they've provided good service for us ever since the city was incorporated, and they provide it at a very good price for our residents." In addition, Nan Drake, petitioner's public relations director and a member of petitioner's contract negotiating team, having testified that Mrs. Harrison is "the one who people like to see at the chamber

functions * * * [and at] the different sponsorship events that we do", acknowledged that petitioner's success derived from its ability to provide good service at a reasonable price.

The testimony of those public officials responsible for awarding the trash hauling contracts demonstrates that petitioner's success in obtaining those contracts was based upon its ability to carry out those contracts in a satisfactory manner and at a reasonable price; i.e., the awards were based upon performance, not reputation for community involvement. Thus, although petitioner has shown that Mrs. Harrison was instrumental in helping petitioner project a positive corporate image in the communities it served, petitioner has not shown that Mrs. Harrison's public relations activities contributed directly to its sales and profits.

        (3)  Personal Guaranties

Courts, including this Court, have developed a series of factors for deciding the deductibility of guaranty fees paid to a shareholder employee:  (1) Whether, given the financial risks, the fees are reasonable in amount; (2) whether businesses of the same type and size as the payor must customarily pay guarantor fees to shareholders; (3) whether the shareholder demanded compensation for the guaranty; (4) whether the payor had sufficient profits to pay a dividend, but failed to do so; and (5) whether the purported guaranty fees were proportional to stock ownership.  See Olton Feed Yard, Inc. v. United States, 592

F.2d 272, 275-276 (5th Cir. 1979); <u>Tulia Feedlot, Inc. v. United States</u>, 513 F.2d 800, 803-806 (5th Cir. 1975); <u>Fong v. Commissioner</u>, T.C. Memo. 1984-402, affd. without published opinion 816 F.2d 684 (9th Cir. 1987); <u>Seminole Thriftway, Inc. v. United States</u>, 42 Fed. Cl. 584, 589-590 (1998) (the guaranty fee cases).

We find no meaningful distinction between the guaranty fee cases and this case where, instead of defending the deductibility of amounts labeled by the payor as guaranty fees, petitioner, in effect, seeks to treat, as guaranty fees, an unspecified portion of an amount originally labeled by the board as "annual compensation, including bonuses". The same deductibility factors should apply under either set of circumstances, with the possible exception of the fifth factor (fees proportional to stock ownership), which would be difficult to apply in the absence of some way to identify the guaranty-fee portion of the payments labeled compensation.

In this case, the shareholder-guarantors did not demand compensation, and there is no evidence in the minutes of the annual board meetings or elsewhere of an intent to compensate them for the guaranties.[4] It is also clear that petitioner had

_____

[4] When Mrs. Harrison executed her $7.5 million personal guaranty of bank loans to petitioner in 1994, she neither requested, received, nor was promised additional compensation as consideration therefor. Moreover, her total compensation as determined by the board of directors for 1994-97 (when her

(continued...)

sufficient retained earnings to pay a dividend. Thus, application of factors (3) and (4) militates against the deductibility of any portion of the amounts paid to Mrs. Harrison during the audit years as compensation for guaranteeing loans to petitioner. Moreover, there is no evidence that businesses of the same type and size as petitioner customarily were required to pay guaranty fees to shareholders (factor (2)).

Petitioner has also failed to establish what amount, if any, would have constituted a reasonable fee for Mrs. Harrison's personal guaranties (factor (1)). There is no evidence of any significant financial risk to her. She was one of four guarantors, each jointly and severally liable for the guaranteed amounts. None of her property was encumbered under the terms of the guaranties, and there was never any threat of default by petitioner as primary debtor. Nor has petitioner shown that there was a disproportionate reliance by the bank on Mrs. Harrison's personal assets to satisfy the potential obligations of the guarantors. Mr. Summers, when asked why the bank required

---

[4](...continued)
continuing guaranty was in effect) was not significantly different as a percentage of total officer compensation from what it had been for the years immediately preceding her guaranty. In fact, her average compensation as a percentage of total officer compensation for 1992 and 1993 (38.5 percent) was actually higher than for 1994-97 (36.5 percent). Thus, there is no evidence to indicate that the board awarded any additional compensation to Mrs. Harrison for the audit years in consideration of her personal guaranty of bank loans to petitioner.

Mrs. Harrison to sign the guaranties, responded that the bank "wanted additional strength or support behind * * * [the collateral], and with her liquidity base, it was important to have her involvement." But it is entirely possible that Mr. Summers would have provided a similar response had he been asked why the bank had required guaranties from Myron, James, and Ralph. Moreover, it appears that much of Mrs. Harrison's wealth may have actually been attributable to the estate of her late husband in the form of the Survivor's Trust that acted as the coguarantor of the $16 million replacement guaranty executed in 1998. There is no evidence as to the relative values of the interests of Mrs. Harrison, Myron, James, and Ralph in the assets of that trust.

Finally, the financial risk to Mrs. Harrison from guaranteeing loans to petitioner was further reduced to the extent that the Bank of America line of credit resulted in loans to Rentals. Petitioner is not entitled to deduct any amount as compensation for Mrs. Harrison's guaranty of loans to Rentals. See Cropland Chem. Corp. v. Commissioner, 75 T.C. 288, 292-295 (1980), affd. without published opinion 665 F.2d 1050 (7th Cir. 1981); Columbian Rope Co. v. Commissioner, 42 T.C. 800, 815-816 (1964); E.B. & A.C. Whiting Co. v. Commissioner, 10 T.C. 102, 116 (1948). Although the overall line of credit from Bank of America to petitioner and Rentals reached approximately $7 million during the audit years, the fact that petitioner's total long-term debt

never exceeded $3.43 million during those years suggests that more than half of the potential benefit may have been derived by Rentals.

Petitioner cites Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1325 n.33 (5th Cir. 1987), affg. T.C. Memo. 1985-267, and R.J. Nicoll Co. v. Commissioner, 59 T.C. at 51, in support of its view that Mrs. Harrison's personal guaranties were an important factor in demonstrating the reasonableness of the compensation paid to her during the audit years. Those cases are representative of a line of cases (the no-fee cases) in which courts, including this Court, have cited employee-shareholder loan guaranties in support of findings that all or a portion of amounts paid to such individuals constituted deductible compensation. See, e.g., Owensby & Kritikos, Inc. v. Commissioner, supra at 1325 n.33 (stating that loan guaranties by key employee-shareholders weigh "in favor of munificent compensation"); Leonard Pipeline Contractors, Ltd. v. Commissioner, T.C. Memo. 1998-315 (noting that an "indispensable" employee-shareholder's personal guaranty of a $1.5 million bank loan was "crucial" to a large project), affd. 210 F.3d 384 (9th Cir. 2000); Ledford Constr. Co. v. Commissioner, T.C. Memo. 1977-204 (giving "some consideration" to the chief executive's personal guaranty of company debt in deciding the reasonableness of his compensation); see also Shotmeyer v. Commissioner, T.C. Memo. 1980-238; Adolph Hanslik Cotton Co. v. Commissioner, T.C.

Memo. 1978-394; <u>Allison Corp. v. Commissioner</u>, T.C. Memo. 1977-166.  In each of those cases, and in <u>R.J. Nicoll Co. v. Commissioner</u>, 59 T.C. 37 (1972), cited by petitioner, the Court simply listed a key employee-shareholder's personal guaranty of corporate employer debt as one of several positive contributions by the employee to the corporate employer.  All of those no-fee cases involve a key employee, usually the person (or one of the persons) most responsible for the success of the corporate employer.  No specific compensatory amount is attributed to the guaranty, and in none of the cases is it certain that the Court would have reached a different result in the absence of the guaranty.[5]  Moreover, in <u>Owensby & Kritikos, Inc. v. Commissioner</u>, <u>supra</u>, the Court of Appeals for the Fifth Circuit hedged its comment regarding the relevance of the loan guaranties by noting that "[t]he record is unclear * * * as to the amount or riskiness of these loans", an allusion to factor (1) in the guaranty fee cases.

Mrs. Harrison's loan guaranties represented one of her principal contributions to petitioner.  They did not, as in the

---

[5]  In <u>Adolph Hanslik Cotton Co. v. Commissioner</u>, T.C. Memo. 1978-394, the Commissioner argued that an amount paid for the guaranty of a line of credit is not "compensation for personal services actually rendered" within the meaning of sec. 162(a)(1) and, therefore, may not be considered in finding the amount that constitutes "reasonable" compensation.  We declined to address that argument on the ground that "[o]ur finding would be the same regardless of whether guarantying such obligations may properly be considered."  <u>Id.</u> at n.14.

no-fee cases, merely supplement her performance of substantial managerial activities on petitioner's behalf.  Therefore, we find those cases to be inapposite.  Rather, we find that the factors utilized in the guaranty fee cases are properly suited to the task of determining what amount, if any, may be considered reasonable compensation for Mrs. Harrison's personal guaranties. Because (1) Mrs. Harrison was willing to issue the guaranties without compensation, (2) there is no evidence that businesses of the same type and size as petitioner customarily paid guarantor fees to shareholders, (3) petitioner had sufficient profits to pay dividends, but failed to do so, and (4) the evidence does not establish what amount, if any, would constitute reasonable compensation for her guaranties, we find that Mrs. Harrison's guaranties do not support the characterization of any amount she received from petitioner as reasonable compensation.  Instead, we view the shareholder guaranties in this case as a means of protecting the shareholders' ownership interests in petitioner, not as a function of their employment by petitioner.  See Olton Feed Yard, Inc. v. United States, 592 F.2d at 275-276 (stating that employee-shareholders' willingness to guaranty, without charge, the corporate employer's debt is evidence that such individuals "signed the guaranties in order to protect and enhance their investment in the corporation").

     b.  External Comparison

This factor invokes a comparison between the employee's salary and salaries paid by similar companies for similar services. Elliotts, Inc. v. Commissioner, 716 F.2d at 1246.

The only evidence relating to this factor is that contained in the report submitted by respondent's expert, Mr. Carey, who likens Mrs. Harrison's activities to those of an outside board chair. He cites, as appropriate compensation for Mrs. Harrison's services, the median compensation paid to board chairs during the audit years by other companies with comparable sales revenues as derived from surveys conducted by Economic Research Institute (ERI). Except for a small ($696) discrepancy for the 1997 taxable year, the compensation amounts derived by Mr. Carey from the ERI data are allowed, by respondent, as reasonable compensation to Mrs. Harrison.

Petitioner objects to Mr. Carey's (and respondent's) characterization of Mrs. Harrison's duties as equivalent to the duties of a board chair and, in particular, to the duties of an outside board chair. Petitioner also questions the relevance of the ERI survey because of its failure to identify the number of responding companies, whether they were public or private, and whether the chairs were from inside or outside the responding companies.

We find that petitioner's objections are unfounded. A general description of the duties of a board chair submitted by Mr. Carey (to which petitioner raises no objection) confirms the

similarity of such duties (which, in pertinent part, include participation "in outside activities which will enhance corporate prestige and fulfill the corporation's public obligations as a member of industry and the community", conducting regular and special board meetings, and carrying out "special assignments") to the principal duties discharged by Mrs. Harrison:  Her community activities as a representative of petitioner and her presiding over (1) petitioner's weekly and annual board meetings and (2) the ad hoc meetings with employees arranged by her sons. Moreover, because very few companies pay fees to inside directors and board chairs, but almost all companies pay fees to outside directors and board chairs, the vast majority of the survey data must relate to outside directors.  Lastly, although it is true that the survey data do not identify the number of responding companies, Mr. Carey describes the ERI surveys as "broadly based", and he bases his conclusions as to board chair compensation on what he describes as a "large-sample survey". Moreover, he specifically declines to rely upon the results of a narrower survey involving only five board chairs.   We give Mr. Carey the benefit of the doubt and assume that, as an acknowledged expert in the area of executive compensation, he has relied upon survey data that are representative of a critical mass of respondents.

Mrs. Harrison's personal guaranties of petitioner's debt were not typical of an outside board chair.  But, for the reasons

discussed in section II.C.4.a.(3), supra, we find that no compensation is properly attributable to those guaranties. Therefore, on the basis of our finding that the rest of Mrs. Harrison's duties were substantially similar to those of an outside board chair who does not otherwise perform the tasks of a chief executive or chief operating officer, we find that Mrs. Harrison's compensation was grossly in excess of what companies of a comparable size pay for such services.

      c.   Character and Condition of the Company

"The focus under this category may be on the company's size as indicated by its sales, net income, or capital value. * * * Also relevant are the complexities of the business and general economic conditions." Elliotts, Inc. v. Commissioner, supra at 1246. In general, petitioner appears to have been a successful, growing company during the 1979-97 period. The problem from petitioner's standpoint is that Mrs. Harrison's very limited management role during the audit years renders this factor (although generally favorable to petitioner) of little or no relevance to our decision.

      d.   Conflict of Interest

This factor focuses on "whether some relationship exists between the taxpaying company and its employee which might permit the company to disguise nondeductible * * * [dividends] as salary * * * deductible under section 162(a)(1)." Id. at 1246. Elliotts, Inc. instructs that such a relationship "may also be

probative of a presence or absence of compensatory intent." Id. at 1246 n.4. In this case, Mrs. Harrison's 46-percent stock ownership interest (with the other 54 percent in the hands of nonadverse family members) indicates the existence of a potential conflict of interest. Moreover, there are several indications of an intent to disguise profit distributions to Mrs. Harrison as deductible salary payments: (1) Petitioner has never declared or paid a dividend, see O.S.C. & Associates, Inc. v. Commissioner, 187 F.3d 1116, 1121 (9th Cir. 1999), affg. T.C. Memo. 1997-300; (2) during the audit years, petitioner's total deduction for officer compensation, on average, equaled 92 percent of pretax income before that deduction, and Mrs. Harrison's compensation alone averaged 35 percent of pretax income for that period, see Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1325-1326; Pac. Grains, Inc. v. Commissioner, 399 F.2d at 607; O.S.C. & Associates, Inc. v. Commissioner, T.C. Memo. 1997-300; (3) officer compensation was determined after the close of the taxable year, when profits for the year were either known or could be estimated with reasonable accuracy, see Owensby & Kritikos, Inc. v. Commissioner, supra at 1329; Ecco High Frequency Corp. v. Commissioner, 167 F.2d 583, 585 (2d Cir. 1948), affg. a Memorandum Opinion of this Court; Rich Plan of N. New England, Inc. v. Commissioner, T.C. Memo. 1978-514.

Petitioner attempts to discount the potential impact of any circumstances indicative of disguised dividends or profit

distributions to Mrs. Harrison by stressing that, despite the large payments to her, petitioner's ROE during the audit years would have been more than satisfactory in the eyes of an independent investor in petitioner. Indeed, the Court of Appeals for the Ninth Circuit in Elliotts, Inc. v. Commissioner, 716 F.2d at 1247, states that, in any potential conflict of interest situation, "it is appropriate to evaluate the compensation payments from the perspective of a hypothetical independent shareholder." The test suggested in Elliotts, Inc. is whether retained earnings "represent a reasonable return on the shareholder's equity in the corporation". Id. Petitioner argues that its ROE during the audit years was more than adequate to satisfy a hypothetical independent investor; and it further argues that that fact alone should make Mrs. Harrison's compensation during those years "presumptively reasonable", consistent with the holding of the Court of Appeals for the Seventh Circuit in Exacto Spring Corp. v. Commissioner, 196 F.3d 833, 839 (7th Cir. 1999), revg. Heitz v. Commissioner, T.C. Memo. 1998-220. Petitioner would restrict the application of the Elliotts, Inc. factors to years in which the corporate employer suffers a loss so that ROE is negative.

Petitioner's approach is not the law in the Ninth Circuit; and the Court of Appeals for the Seventh Circuit, in Exacto Spring (a case involving the reasonableness of compensation paid to an employee-shareholder "indispensable to Exacto's business"

and "essential to Exacto's success"), specifically acknowledges that the independent investor test would not be appropriate in a case in which ROE, "though very high, is not due to the * * * [employee's] exertions", or in a case in which the purported salary payment "really did include a concealed dividend".  Id.; accord Haffner's Serv. Stations, Inc. v. Commissioner, 326 F.3d 1, 5 (1st Cir. 2003) ("Even if the company performed well in the subject period and even if executives at comparable companies got large packages * * * a neutral owner would not pay * * * [employee-shareholders] handsomely for producing results for which others * * * were responsible"), affg. T.C. Memo. 2002-38. To the same effect, in Dexsil Corp. v. Commissioner, T.C. Memo. 1999-155, the Court stated:

> We do not believe that the hypothetical investor would
> have looked solely at rate of return and ignored the
> availability of other executives at less compensation
> than that paid Lynn; we do not believe that Lynn was
> the sole reason for Dexsil's success to the extent that
> other officer-shareholders were in the cases relied on
> by petitioner * * *.

Similarly, in Elliotts, Inc. v. Commissioner, supra at 1247 n.6, the Court of Appeals for the Ninth Circuit states that an ROE satisfactory to an independent investor is "probative [not conclusive] of * * * [the employee-shareholder's] management contributions to * * * [the employer]."

Because petitioner's overall profit for the audit years was primarily attributable to the efforts of Myron, James, and Ralph, not to those of Mrs. Harrison, see supra section II.C.4.a., and

because (as discussed in this section) the evidence strongly suggests an intent to distribute profits to Mrs. Harrison in the guise of compensation, we find that an independent investor in petitioner would object to the size of Mrs. Harrison's compensation, even assuming arguendo that petitioner's retained earnings for the audit years represented a reasonable return on shareholder equity when viewed in relation to the ROE at comparable companies. Thus, application of this factor furnishes additional evidence that Mrs. Harrison was greatly overcompensated during the audit years.[6]

---

[6] Even assuming petitioner's ROE were relevant to our decision in this case, petitioner's computation of ROE during the audit years is open to question.

Petitioner argues that ROE represents net profit (after taxes) divided by equity (defined as invested capital plus retained earnings less treasury stock), and that petitioner's ROE for the audit years was either 22 percent (using beginning year equity) or 12.3 percent (using the average of beginning year and yearend equity). Petitioner stresses that either result compares favorably with the 14.9 percent ROE for comparably sized companies during the same period as compiled by Mr. Carey. Petitioner ignores ROE derived from using yearend equity, presumably because, under that approach, average ROE for the audit years is 7.4 percent, substantially below the 14.9 percent average ROE for comparably sized companies. In fact, it is unclear which of the three approaches is proper in this case because it is not known which approach was used in the computation of ROE for the comparably sized companies reflected in Mr. Carey's report.

Another reason to question the use of petitioner's annual ROE in evaluating shareholder return is the inability to follow, on the basis of the returns as filed, all of the year-to-year changes in equity. For several years, those changes cannot be explained by the income (or loss) for the year, and the description of the reconciling item is either unclear or not

(continued...)

### e.  Internal Inconsistency

Evidence of an internal inconsistency in the determination of employee compensation may indicate the presence of unreasonable compensation to employee-shareholders.  Elliotts, Inc. v. Commissioner, 716 F.2d at 1247.  Such evidence may also be "probative of a presence or absence of compensatory intent."  Id. at n.7.  In addition, "salaries paid to controlling shareholders are open to question if, when compared to salaries paid nonowner management, they indicate that the level of compensation is a function of ownership, not corporate management

---

[6](...continued)
attached to the copy of the return in evidence.

Moreover, because petitioner's equity remained essentially constant while its sales and assets increased, ROE does not appear to be an appropriate measure of shareholder return in this case.  For example, comparing 1988-90 with the audit years (1995-97), average yearend equity increased only 4 percent whereas average sales increased 129 percent and average yearend assets increased 215 percent.  Under such circumstances, it would appear that either ROA or ROS would be superior to ROE as a measure of performance.  For the audit years, both ROA and ROS were quite low (average ROA was .9 percent and average ROS was .27 percent).

Alternatively, ROE might be an appropriate measure of performance if petitioner's fair market value were substituted for "book" equity.  In that connection, we note that book equity has not always been used in computing return on equity.  See Lumber City Corp. v. Commissioner, T.C. Memo. 1996-171 (holding that the amount paid by the employee-shareholder for a stock interest in his employer, rather than book shareholder equity, was appropriate for use in determining whether return on investment was sufficient to satisfy an independent investor).  That alternative approach is not available in this case because, aside from Mr. Carey's admitted speculation that petitioner was worth between $12 million and $20 million, there is no evidence as to petitioner's fair market value during the audit years.

responsibility." Id. at 1247. In this case, it is clear from the minutes of the annual board meetings that officer compensation was determined after the close of the taxable year when earnings availability was either known or could be estimated with reasonable accuracy. There is nothing in the board minutes, nor is there any other evidence, to indicate that compensation for nonofficer employees was set in the same manner. The sole exception pertained to modest ($4,000) bonuses for a single employee for the 1994 and 1995 tax years, which were also awarded after the close of the taxable year.

There is also evidence that the salaries paid to petitioner's controlling shareholders greatly exceeded the salaries paid to nonowner management. In 1995 (the only year for which the record contains nonshareholder employee salary information), the highest salary for a nonshareholder employee was $79,639, paid to the company controller who reported to Myron. That is less than 10 percent of the amount paid to Mrs. Harrison and approximately 17 percent of the compensation paid to Myron, James, and Ralph individually. Petitioner has failed to introduce any evidence that might justify such large differences in compensation.

The evidence pertaining to this factor also indicates that Mrs. Harrison's compensation during the audit years was more a function of her stock ownership than of the value of the services.

III.  Conclusion

    We consider respondent's analogy of Mrs. Harrison's activities on petitioner's behalf to the duties performed by an outside board chair to be apposite.  Moreover, Mr. Carey's focus on the median compensation paid to outside board chairs at comparably sized companies appears reasonable in the absence of evidence that Mrs. Harrison's services should place her in either a higher or lower percentile.  We find, however, that Mrs. Harrison's lifetime devotion to petitioner's business, the respect for her judgment accorded by her sons who actually ran the business on a day to day basis, and her dedication in the performance of her public relations function, even at an advanced age, afforded benefits to petitioner (whether tangible or intangible) that were unlikely to have been afforded by an outside board chair.  We find that the value of those additional benefits is adequately reflected by an 80-percent premium over and above the median compensation paid to an outside board chair during the audit years.  Therefore, we hold that petitioner may deduct the following amounts (rounded to the nearest $1000) as compensation for services performed by Mrs. Harrison during each of the audit years:

| TYE 6/30 | Amount |
|----------|--------|
| 1995 | $98,000 |
| 1996 | 101,000 |
| 1997 | 106,000 |

Decision will be entered

under Rule 155.