T.C. Memo. 2005-114


UNITED STATES TAX COURT


MILLER & SONS DRYWALL, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1241-03.                    Filed May 19, 2005.


<u>Rodger G. Mohagen</u>, for petitioner.

<u>David W. Sorensen</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


GOEKE, <u>Judge</u>:  On January 6, 2003, respondent issued a notice of deficiency determining Federal income tax deficiencies for petitioner's tax years ended June 30, 1998, 1999, and 2000, of $82,686, $83,016, and $103,855, respectively.  Among other things, respondent partially disallowed petitioner's deductions for compensation paid to its shareholder-employees of $204,577 in

1998, $242,227 in 1999, and $292,474 in 2000. Respondent disallowed these deductions because he determined that the compensation petitioner paid to its shareholder-employees was unreasonable under section 162(a).[1] Petitioner timely petitioned this Court. After concessions, the remaining issue for decision is whether petitioner's payments to its shareholder-employees were reasonable for the years in issue. We hold that they were.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. When petitioner petitioned this Court, its principal place of business was in Fargo, North Dakota.

A. General Background

Darle Miller (Darle) and his father entered the drywall construction business in the mid-1970s. Darle acquired the drywall construction business from his father before 1980 and initially operated it as a sole proprietorship. Darle incorporated the business on July 1, 1980, as a C corporation. Darle paid $2,000 for 200 shares of petitioner's stock, and Darle's brother Dean Miller (Dean) paid $2,500 for 50 shares of

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

petitioner's stock.[2]  On June 30, 1982, Dean paid $2,150 to petitioner for 43 additional shares of its stock, and Darle's other brother Rocky Miller (Rocky) paid $4,650 to petitioner for 93 shares of stock.  From June 30, 1982, until June 30, 2000, petitioner was owned by the three brothers as follows:

| Shareholder | Percent Ownership |
| --- | --- |
| Darle Miller | 51.8% |
| Dean Miller | 24.1 |
| Rocky Miller | 24.1 |

Since its inception, petitioner's tax year has ended June 30.

B.    Petitioner's Business

Petitioner's primary business was interior wall construction.  Wall construction includes the placing of studs, insulating the walls, hanging drywall and other wall materials as required, and drywall taping (collectively, the drywall construction business).  Since the early 1990s, petitioner has limited its geographic business area to Fargo, North Dakota, and Moorhead, Minnesota.

Petitioner was a subcontractor.  It was awarded construction jobs from general contractors by submitting the lowest bid to complete a specific job (a lowest bid commodity business).  Petitioner primarily bid on commercial construction projects.  After being awarded a job, petitioner purchased the supplies

---

[2]The record is devoid of an explanation why Darle paid less than Dean for each share of petitioner's stock.

Darle anticipated it needed to complete the job and arranged for them to be delivered to the job site. Petitioner maintained a small inventory of drywall, studs, and mud at its warehouse.

## C.   Competition in the Drywall Business

The drywall construction business is a competitive industry because jobs are generally awarded to the lowest bidder, and because a minimal capital investment allows a competitor to enter the drywall construction industry. A drywall construction business is established with a capital investment of about $300, which is used to purchase a tool belt, a screw gun and cord, and a T-square. There are no proficiency exam requirements, but petitioner is required to have a contractor's license to place its bids with general contractors.

## D.   Petitioner's Shareholder-Employees

### 1.   Darle Miller

Darle was the chief executive officer (CEO) and president of petitioner. He performed many duties as CEO, including preparing and submitting job bids, scheduling projects and jobs, hiring and coordinating employees, coordinating activities between petitioner and the general contractors, ordering supplies, dealing with payroll issues, and confronting any problems that arose. Darle usually arrived at the office by 7 a.m., opened it for business, checked messages, and returned phone calls. It was common for Darle to deliver supplies and equipment to the

different job sites when Rocky and Dean were unavailable. Darle occasionally even performed labor-intensive tasks including, but not limited to, hanging sheet rock, drywall taping, and unloading materials at different job sites. Darle regularly brought job plans home with him at night to estimate the cost of completing a job.

The success of petitioner's business depended on accurately estimating the cost of completing a job. After Darle estimated the cost of completing a potential job, he determined the amount petitioner would bid to maximize profits and, at the same time, remain competitive in the bidding process.

On average, Darle worked 55 hours per week during the years in issue, but worked 60 to 65 hours per week when petitioner was establishing itself in the drywall construction industry.

2. Rocky Miller

Rocky was petitioner's vice president. His primary duty was job-site supervisor, which required him to supervise the workers on a job site, determine what materials were needed on a job site, hire and fire employees on petitioner's behalf, coordinate the progress of each job with Darle, and perform other day-to-day operations. Rocky performed additional duties including, inter alia, delivering materials to the job sites and performing physical labor, such as hanging sheetrock, drywall taping, repairing equipment, and removing snow at the sites.

A usual workday for Rocky began around 5:30 a.m. with loading the materials needed at a specific job site into petitioner's work trucks. Rocky then delivered those materials to the job site. When petitioner was engaged in many small jobs, Rocky went to multiple sites during a single workday. Rocky's workday ended around 5:30 p.m. During the years in issue, Rocky worked an average of 55 to 60 hours per week.

3. <u>Dean Miller</u>

Dean was petitioner's secretary/treasurer. However, Dean primarily functioned as a job-site supervisor, which required him to perform the same duties as Rocky. Dean's typical workday and workweek were similar to Rocky's.

E. <u>Compensation Paid by Petitioner to Its Shareholder-Employees</u>

For tax years ended after June 30, 1996, Darle's base salary was $300,000, except for the taxable year ended June 30, 1999, when his base salary was $282,501. Darle was paid a bonus for the tax years ended June 30, 1984 through 1997, and 2000. Darle's total compensation was as follows:

| TYE June 30 | Base Salary | Bonus | Total Compensation |
|---|---|---|---|
| 1983 | $36,000 | $22,000 | $58,000 |
| 1985 | 36,000 | 133,000 | 169,000 |
| 1987 | 36,000 | 40,000 | 76,000 |
| 1988 | 36,000 | 60,000 | 96,000 |
| 1989 | 36,000 | 60,000 | 96,000 |
| 1990 | 36,000 | 119,057 | 155,057 |
| 1991 | 88,000 | 120,000 | 208,000 |
| 1992 | 41,000 | 167,208 | 208,208 |
| 1993 | 60,000 | 181,248 | 241,248 |
| 1994 | 72,000 | 270,160 | 342,160 |
| 1995 | 72,000 | 258,480 | 330,480 |
| 1996 | 300,000 | 86,000 | 386,000 |
| 1997 | 300,000 | -0- | 300,000 |
| 1998 | 300,000 | -0- | 300,000 |
| 1999 | 282,501 | -0- | 282,501 |
| 2000 | 300,000 | 140,000 | 440,000 |

Dean and Rocky each received base annual salaries of $90,000 for each tax year after 1996. Dean and Rocky were both paid bonuses during all 3 tax years in issue. Petitioner paid Dean and Rocky the same amount of total annual compensation (salary plus bonus), but the total amounts varied from year to year. The following table represents Rocky's and Dean's individual compensation:

| TYE June 30 | Base Salary | Bonus | Total Compensation |
|---|---|---|---|
| 1983 | $36,000 | $15,000 | $51,000 |
| 1985 | 36,000 | 104,700 | 140,700 |
| 1987 | 36,000 | 30,000 | 66,000 |
| 1988 | 36,000 | 40,000 | 76,000 |
| 1989 | 36,000 | 30,000 | 66,000 |
| 1990 | 36,000 | 40,471 | 76,471 |
| 1991 | 56,404 | 40,000 | 96,404 |
| 1992 | 34,900 | 61,196 | 96,096 |
| 1993 | 43,200 | 69,376 | 112,576 |
| 1994 | 48,000 | 109,920 | 157,920 |
| 1995 | 48,000 | 105,760 | 153,760 |
| 1996 | 90,000 | 109,000 | 199,000 |
| 1997 | 90,000 | 60,000 | 150,000 |
| 1998 | 90,000 | 60,000 | 150,000 |
| 1999 | 90,000 | 60,000 | 150,000 |
| 2000 | 90,000 | 160,000 | 250,000 |

F.   Petitioner's Financial Condition

From 1980 through 1982, the shareholder-employees capitalized petitioner with contributions of property totaling $11,300.  No additional capital contributions were made.  As of June 30, 2000, petitioner had retained earnings of $781,702 and total shareholder equity of $793,002.  Petitioner never declared a dividend.

OPINION

Section 162(a)(1) permits a taxpayer to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered". A taxpayer can take a deduction for compensation only if: (1) The payments were reasonable in amount, and (2) the payments were for services actually rendered. Sec. 1.162-7(a), Income Tax Regs.

Petitioner argues that the total compensation it paid to its shareholder-employees was deductible because it was reasonable under section 162(a). Respondent avers that the amounts of compensation for petitioner's tax years ended June 30, 1998 through 2000, were unreasonable and were, instead, disguised dividends. In this case, the parties agree that the sole issue is whether the payments petitioner made to its shareholder-employees were reasonable.

I. Applicable Caselaw

Because this case appears to be appealable to the Court of Appeals for the Eighth Circuit, see sec. 7482(b)(1)(B), we shall follow the relevant decisions of that circuit, see Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

Whether the compensation paid by a corporate taxpayer to a shareholder-employee was reasonable is a question of fact. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1323

(5th Cir. 1987), affg. T.C. Memo. 1985-267; Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1245 (9th Cir. 1983), revg. T.C. Memo. 1980-282; Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 151 (8th Cir. 1974), affg. T.C. Memo. 1973-130. Situations indicating that shareholder-employees were not dealing with the corporation at arm's length warrant close scrutiny. This ensures that no part of the purported compensation was a disguised dividend. Owensby & Kritikos, Inc. v. Commissioner, supra; Heil Beauty Supplies, Inc. v. Commissioner, 199 F.2d 193, 194 (8th Cir. 1952), affg. a Memorandum Opinion of this Court dated Dec. 13, 1950. Numerous factors have been used in determining the reasonableness of compensation, with no single factor being dispositive. See Rapco, Inc. v. Commissioner, 85 F.3d 950, 954 (2d Cir. 1996) (applying the factor analysis from the perspective of an independent investor), affg. T.C. Memo. 1995-128; Owensby & Kritikos, Inc. v. Commissioner, supra at 1323; Pepsi-Cola Bottling Co. v. Commissioner, 528 F.2d 176, 178 (10th Cir. 1975), affg. 61 T.C. 564 (1974); Charles Schneider & Co. v. Commissioner, supra at 152 (identifying nine factors); RTS Inv. Corp. v. Commissioner, T.C. Memo. 1987-98 (identifying eight factors), affd. 877 F.2d 647 (8th Cir. 1989). But cf. Exacto Spring Corp. v. Commissioner, 196 F.3d 833, 838 (7th Cir. 1999) (applying the "independent investor test" rather than the multiple-factor approach used by the majority of circuits), revg.

Heitz v. Commissioner, T.C. Memo. 1998-220.  These factors include, but are not limited to:  (1) Employee qualifications; (2) the nature, extent, and scope of the employee's work; (3) the size and complexity of the business; (4) prevailing general economic conditions; (5) the employee's compensation as a percentage of gross and net income; (6) the employee-shareholders' compensation compared with distributions to shareholders; (7) the employee-shareholders' compensation compared with that paid to non-shareholder-employees or paid in prior years; (8) prevailing rates of compensation for comparable positions in comparable concerns; and (9) comparison of compensation paid to a particular shareholder-employee in previous years where the corporation has a limited number of officers.

     The Court of Appeals for the Eighth Circuit has not applied the independent investor test, but in Wagner Constr., Inc. v. Commissioner, T.C. Memo. 2001-160, which would have been appealable to the Court of Appeals for the Eighth Circuit, we applied the independent investor test as a lens through which we view each factor.  See also Haffner's Serv. Stations, Inc. v. Commissioner, T.C. Memo. 2002-38, affd. 326 F.3d 1 (1st Cir. 2003).  In general, this test questions whether an inactive, independent investor would have been willing to pay the amount of disputed compensation on the basis of the facts of each

particular case.  See Elliotts, Inc. v. Commissioner, supra at

1246; Haffner's Serv. Stations, Inc. v. Commissioner, supra.

This test allows us to decide whether the amount of compensation

paid to petitioner's shareholder-employees would have been the

same had they engaged in an arm's-length negotiation.  See also

Heil Beauty Supplies, Inc. v. Commissioner, supra at 194.  One

important inquiry in applying this test is whether the

corporation's shareholders received a fair return on their

investments.  See Rapco, Inc. v. Commissioner, supra at 955.

In performing our analysis, we generally review each

shareholder-employee's compensation separately because whether

his salary was reasonable depends on the services he performed.

See RTS Inv. Corp. v. Commissioner, supra.  In this case, we

shall review Dean's and Rocky's salaries concurrently because

they performed similar services for petitioner.

II.  Burden of Proof

Under Rule 142(a), petitioner has the burden of proving that

the compensation paid to its shareholder-employees was reasonable

for deduction purposes.  See Welch v. Helvering, 290 U.S. 111,

115 (1933).  Section 7491(a) provides a taxpayer with the

opportunity to shift the burden of proof to the Commissioner

under specific circumstances.  To shift the burden of proof, a

taxpayer must have complied with all the requirements in section

7491(a).  See Higbee v. Commissioner, 116 T.C. 438 (2001); E.J.

Harrison & Sons, Inc. v. Commissioner, T.C. Memo. 2003-239.
Here, petitioner has not argued the application of section 7491
nor established that it satisfied the requirements in section
7491.  Nevertheless, we decide this case on the preponderance of
the evidence, and therefore it is unaffected by section 7491.
See Blodgett v. Commissioner, 394 F.3d 1030, 1035 (8th Cir.
2005), affg. T.C. Memo. 2003-212.

III.  Expert Testimony

Leonard J. Sliwoski, C.P.A., Ph.D, testified at trial as an
expert witness on petitioner's behalf.  William C. Herber,
C.B.A., testified at trial as an expert witness on respondent's
behalf.  At trial, the parties orally stipulated the
qualifications of both Dr. Sliwoski and Mr. Herber.  Opinion
testimony of an expert is admissible if it assists the trier of
fact in understanding evidence that will determine a fact in
issue.  See Fed. R. Evid. 702.  We decide, as the trier of fact,
the weight afforded a witness's testimony, and we are not
compelled to accept any testimony even when it is uncontradicted.
See McGraw v. Commissioner, 384 F.3d 965, 972 (8th Cir. 2004),
affg. Butler v. Commissioner, T.C. Memo. 2002-314; Paul E. Kummer
Realty Co. v. Commissioner, 511 F.2d 313, 315 (8th Cir. 1975),
affg. T.C. Memo. 1974-44.

IV.  Evidentiary Issue

Petitioner requests that judicial notice be taken of the

Risk Management Association (RMA) Annual Statement Studies 1998-1999, 1999-2000, and 2000-2001, and the Methodology/Disclaimer from the October 1, 2001, Database of the Executive Compensation Assessor software and database published by the Economic Research Institute (ERI).  Respondent objects to petitioner's request because petitioner did not indicate which RMA studies it wanted the Court to take judicial notice of, and the information contained in both the RMA and ERI materials does not meet the criteria under rule 201 of the Federal Rules of Evidence and this Court's jurisprudence.

Rule 201(b) of the Federal Rules of Evidence provides:

Kinds of facts.  A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

See also Estate of Reis v. Commissioner, 87 T.C. 1016, 1026-1027 (1986).

These materials were relied on by both parties' experts to form their respective opinions.  We have heard the testimony of both experts and have reviewed their respective reports, including the materials in issue, which were attached to the expert reports.  The experts relied on these materials, but they bolstered their opinions with facts other than those considered in producing these materials.  Each expert testified, and his respective opinion was subject to cross-examination.  While an

expert can rely on data that is not admissible to form his opinion, such reliance does not elevate the evidence to be admissible for the truth of the matter asserted. Fed. R. Evid. 703.

Petitioner contends that even though the ERI data considers businesses similar to it, "exceptional business data is not available". Petitioner's statement identifies the issues related to the application of this data to the instant case. The ERI and RMA materials are compilations of data that we do not believe rise to the level required by rule 201(b) of the Federal Rules of Evidence. For these reasons, we do not find these materials subject to judicial notice. However, since we analyzed the data contained therein in the context of the experts' reports and testimony, whether these materials are admissible does not change our analysis.

V.    Compensation Paid for Prior Year's Services

Petitioner claims that a portion of the total compensation paid to its shareholder-employees during the tax years in issue was to remedy past undercompensation. Under some circumstances, a taxpayer may deduct compensation paid in one year for services rendered in prior years. Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119 (1930). But to deduct amounts paid as compensation for past undercompensation, a taxpayer must show: (a) Its intention that part of the current payments compensate employees for past

services, and (b) the amount of the past undercompensation.  See
<u>Pac. Grains, Inc. v. Commissioner</u>, 399 F.2d 603, 606 (9th Cir.
1968), affg. T.C. Memo. 1967-7; <u>Estate of Wallace v.
Commissioner</u>, 95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th
Cir. 1992); <u>Haffner's Serv. Stations, Inc. v. Commissioner</u>, T.C.
Memo. 2002-38; <u>Wagner Constr., Inc. v. Commissioner</u>, T.C. Memo.
2001-160.

The parties stipulated that petitioner's board of directors
meeting minutes indicate that in the tax year ended June 30,
1985, petitioner intended to compensate its shareholder-employees
for past services.  The record shows that the amount of
compensation paid in that tax year was much larger than it had
been in 1983[3] and the 4 subsequent years.  This indicates that
the payments were intended to rectify past undercompensation for
services rendered.  No such stipulation exists for the years in
issue, and no board of directors meeting minutes for the years in
issue are in the record.

Additionally, in each tax year ending June 30, 1992 through
1996, the total compensation for a shareholder-employee of
petitioner generally increased or remained consistent.  During
each tax year ending June 30, 1997 through 1999, each of
petitioner's shareholder-employees received less total

---

[3]These figures are taken from the expert reports.  There are
no compensation figures for 1984 in either report.

compensation than he had during the June 30, 1996, tax year. These facts do not support a conclusion that during the years in issue, petitioner was making catchup payments for the years prior to 1997. Of the years in issue, only for the tax year ended June 30, 2000, did petitioner's shareholder-employees receive compensation over that paid in 1996. The record establishes that this increase resulted from petitioner's obtaining its most profitable job ever, not from petitioner's intention to remedy past undercompensation. Even if petitioner intended some of the payments in issue to remedy past undercompensation, petitioner failed to establish the amount of the past undercompensation or how much catchup compensation was allegedly paid during each year in issue. Therefore, we hold that none of the compensation petitioner paid for the years in issue was to remedy past undercompensation.

We do not include this as a factor in our reasonableness-of-the-compensation analysis because such a finding would not necessarily indicate the shareholder-employees were overcompensated. Instead, that analysis is based on the factors discussed below.

VI. Application of Reasonable Compensation Factors

A.   Employee Qualifications

An employee's superior qualifications may justify high compensation for his services. See Charles Schneider & Co. v.

Commissioner, 500 F.2d at 152; Wagner Constr., Inc. v. Commissioner, supra.

Petitioner claims that through Darle's, Rocky's, and Dean's exceptional qualifications it was able to maintain fairly consistent yearly sales and remain profitable in a highly competitive industry. Respondent agrees that Darle, Rocky, and Dean did "contribute superior qualifications to the successful operation of the petitioner[']s business".

A factor that contributed to petitioner's success was petitioner's ability to obtain profitable construction jobs. Petitioner obtained jobs primarily by submitting the lowest bid to a general contractor, and Darle was solely responsible for preparing each bid. Darle's estimate of the cost to complete a job was the most significant aspect of preparing a bid. If Darle's estimate was inaccurate, petitioner would neither receive the job, because its bid was too high, nor make a profit. Darle therefore deserved high compensation because of his knowledge and experience.

Although Rocky was petitioner's vice president and Dean was petitioner's treasurer during the years in issue, the facts indicate that they primarily performed the duties of job-site supervisors, not executives. Each has been working for petitioner since the early 1980s and worked between 55 and 60 hours per week during the 1990s and 2000. Petitioner's financial

success was directly correlated with completing jobs within budget. As supervisors with about 20 years of experience each, Rocky and Dean made sure each job was completed in an efficient, cost-effective manner. Their knowledge and experience warranted high compensation for their services for each year in issue.

This factor favors petitioner.

B. Nature, Extent, and Scope of an Employee's Work

An employee's position, duties performed, hours worked, and general importance to the corporation's success may justify high compensation. See Charles Schneider & Co. v. Commissioner, supra at 152.

1. Darle

Petitioner argues that Darle was a key employee. Mr. Herber, respondent's expert, similarly opined that Darle was the key employee of petitioner. Petitioner's business model was to maintain consistent yearly sales. Petitioner's success depended on two things: (1) Accurately estimating the cost of completing a job, and (2) completing the job within budget. Darle was the sole individual responsible for preparing these bids. In addition to performing his duties as petitioner's CEO, Darle performed many other tasks. Darle also testified that he worked about 50 hours per week during the years in issue. We believe that Darle's 20 years of experience were irreplaceable to petitioner. Therefore, we find that the nature, extent, and

scope of Darle's work justify high compensation.  This factor weighs in favor of petitioner with respect to Darle's compensation.

### 2. Rocky and Dean

Petitioner has not offered any evidence detailing Rocky's or Dean's duties as officers, but the record makes it clear that Rocky and Dean primarily worked as job-site supervisors.

Petitioner's position appears to be that job-site supervisors are important to its success.  We agree.  Because petitioner's jobs are awarded in a low-bid process, it was necessary for petitioner to remain within its budget.  This was confirmed by Darle's testimony that employee productivity was one of the keys to petitioner's profitability.  Rocky and Dean made this happen.  According to the Minnesota Work Force Center 1999 Salary Survey, relied on by both experts, Rocky's and Dean's duties appeared to be similar to those of a construction manager who has numerous responsibilities.  One specific duty of a construction manager was to make sure a job was completed within budget.  Both Rocky and Dean had about 20 years of supervisory experience, and this experience added to petitioner's success.

Respondent argues that the nature, extent, and scope of Rocky's and Dean's services are not "in any way unique to the petitioner."  We do not believe that the uniqueness of their services is dispositive of this factor.  Rocky and Dean were both

integral to petitioner's success, and each averaged between 55 and 60 work hours per week during the years in issue. Rocky and Dean arrived at petitioner's place of business at about 5:30 a.m. to load the work trucks and deliver the materials to specific job sites. Rocky and Dean hung drywall and performed any other physical task that needed to be done. Petitioner's consistent sales and substantial pretax profit margins before shareholder-employees compensation were due in part to the skills, dedication, and efforts of Rocky and Dean. We find the extent and scope of Rocky's and Dean's duties warrant high compensation. This factor favors petitioner with respect to Rocky's and Dean's compensation.

C. Size and Complexity of Petitioner's Business

Courts consider the size and complexity of a taxpayer's business when deciding the reasonableness of compensation paid to its shareholder-employees. See RTS Inv. Corp. v. Commissioner, 877 F.2d at 651; Charles Schneider & Co. v. Commissioner, 500 F.2d at 152. A company's size is determined by its sales, net income, gross receipts, or capital value. See Beiner, Inc. v. Commissioner, T.C. Memo. 2004-219; Wagner Constr., Inc. v. Commissioner, T.C. Memo. 2001-160.

During the tax years in issue, petitioner was a small business, as measured by its annual gross sales, and its business model indicates it was not interested in growth. After reviewing

petitioner's financial documents, both experts concluded that petitioner's annual sales were fairly constant during the 1990s. Petitioner argues that these facts tip the scale in its favor. Respondent conversely contends that this factor supports the position that the shareholder-employees were unreasonably compensated because petitioner's business was small and simple. As we understand this argument, respondent believes petitioner's business was simple because a competitor could establish a drywall construction business for a mere $300 investment, and because the drywall business did not require substantial scientific and highly technical knowledge. See B & D Foundations, Inc. v. Commissioner, T.C. Memo. 2001-262.

We do not agree with either party's analysis. Petitioner's consistent sales and net income do not show that its business was large or complex. Nothing in the record supports a finding that petitioner's business was different from any other drywall construction business, except that its business model was to maintain consistent yearly sales. An independent investor would have been unwilling to increase an employee's compensation where the corporation is not expected to increase sales because that could have decreased the investor's return (assuming costs remained the same). Similarly, an independent investor might have been hesitant to increase an employee's compensation where the employee had no substantial or specified training.

On the other hand, although the drywall business did not require highly technical knowledge, petitioner's shareholder-employees developed the skills and methods to accurately bid on and complete projects within budget. An individual could have entered the drywall construction business with a mere $300 investment, but there was no guarantee of success. Darle credibly testified that a number of competitors emerged and failed since petitioner has been in existence. Petitioner has been engaged in the drywall business for more than 20 years, and its success depends on the time-tested skills and judgment of its key employees. In a competitive industry such as this, petitioner's development of business methods and techniques directly related to its success. The successful execution of these methods was complex or, at a minimum, difficult. We also believe that the leanness of petitioner's management and the multiple duties each shareholder-employee performed further weigh against respondent. Consequently, we find this factor to favor petitioner.

D. General Economic Conditions

Another factor we take into consideration is the employee's impact on the corporation's success compared to the impact of the general economic conditions. See RTS Inv. Corp. v. Commissioner, supra at 651. This comparison helps indicate whether the

business's success is attributable to the employee's prowess and acumen or to other economic factors.

Petitioner argues its business was insulated from the existing economic conditions. Dr. Sliwoski's report states that petitioner was shielded from economic fluctuations when compared to other similar businesses because of its exceptional management and business model that focused on consistent sales rather than growth. Dr. Sliwoski did acknowledge in his report that the economic conditions were favorable for the entire construction industry during much of the 1990s. Given the favorable economic conditions, respondent urges us to hold that the compensation petitioner paid Darle, Rocky, and Dean was unreasonable. We agree that the economic conditions were favorable, but whether this factor supports either party depends on how these conditions affected petitioner's business.

Petitioner's gross yearly sales in the 1990s remained fairly consistent. Only during the tax year ended June 30, 2000, did petitioner have a significant spike in sales. This spike was mostly attributable to one large job petitioner had obtained. Given petitioner's business model and its consistent annual gross sales, we believe the economic conditions had, at most, a minimal impact on its success. In addition, nothing in the record indicates that any of petitioner's shareholder-employees worked fewer hours because the economic conditions were favorable. No

matter how favorable the economic conditions were, petitioner's success depended on obtaining jobs through the bidding process and completing each job within budget. In other words, petitioner's success depended on how well Darle, Dean, and Rocky performed their respective jobs, not on the economy's health. We hold that this factor weighs in petitioner's favor because its success was not a function of economic circumstances.

E. Comparison of Salaries With Distributions to Stockholders and Retained Earnings

The Court of Appeals for the Eighth Circuit has stated that the "absence of dividends to stockholders out of available profits justifies an inference that some of the purported compensation really represented a distribution of profits as dividends." Paul E. Kummer Realty Co. v. Commissioner, 511 F.2d at 315; Charles Schneider & Co. v. Commissioner, 500 F.2d at 153; see also RTS Inv. Corp. v. Commissioner, 877 F.2d at 651. Petitioner never declared a dividend.

However, corporations generally are not required to pay dividends. In addition, Darle testified that petitioner did not pay dividends because it wanted a financial cushion in case it had difficulty obtaining jobs. Petitioner had retained earnings of $781,702 as of June 30, 2000. Respondent would argue that petitioner's retained earnings exceeded the amount needed to sustain its business. We do not find these amounts so excessive as to warrant us to second-guess Darle's business judgment.

As we have mentioned, the independent investor test measures whether a corporation's shareholders received a fair return on their investment.  Return on equity measures the appreciation of the stockholders' investments through the corporation's retainment of earnings.  See Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1326-1327; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1161 (1980); see also Rev. Rul. 79-8, 1979-1 C.B. 92 (stating compensation may be reasonable even when the corporation never paid a substantial portion of its earnings and profits as a dividend).

Each party's expert analyzed whether an independent investor would consider the amount of compensation paid by petitioner reasonable in light of the return on equity (ROE) petitioner's shareholders received.  To do this, the experts first determined the appropriate assumed rate of return on equity that an independent investor would find acceptable for each year in issue.  The parties do not agree on the assumed equity rate of return.  The second step is to determine the appropriate period in which to compare the ROE received by petitioner's shareholders with the assumed rates.  The parties do not agree on the appropriate period.

### 1. Assumed Rate of Return

Both experts used the build-up approach to calculate the assumed rate of return for the tax years in issue. The build-up approach starts with the risk-free rate of return for the year in issue, and three adjustments are made: An equity risk adjustment, a size adjustment, and a company-specific risk adjustment. The only adjustment the parties do not agree on is the company-specific risk adjustment. This adjustment cannot be found in reference materials; rather, it requires a factual determination.

Dr. Sliwoski, petitioner's expert, found a company-specific risk adjustment of negative 2.5 percent because he determined that petitioner was subject to minimal business risks and extremely minimal financial risk. By contrast, Mr. Herber, respondent's expert, concluded that the company-specific risk adjustment should be positive 5 percent for each tax year in issue. Mr. Herber considered petitioner's size (as measured by annual sales), industry risks, lack of management depth, and the competitive nature of the drywall construction business as factors in making the company-specific adjustment.

Having reviewed the parties' respective positions, we disagree in part with each expert's company-specific risk adjustment analysis. We find the total company-specific risk adjustment to be negative 2 percent for each year in issue. We

make the negative-2-percent adjustment on the basis of petitioner's conservative capital structure as reflected in its ample cash reserves and borrowing capacity as defined by Dr. Sliwoski, low debt-to-equity ratio, and business model to maintain consistent yearly sales.

Therefore, we hold that an independent investor would find the following assumed rates of return acceptable:

| Factor | TYE June 30, 1998 | TYE June 30, 1999 | TYE June 30, 2000 |
|---|---|---|---|
| Risk-free rate | 6.0% | 5.4% | 6.8% |
| Equity risk premium | 8.2 | 8.4 | 8.5 |
| Size premium | 3.3 | 2.6 | 4.3 |
| Company specific risk premium | (2.0) | (2.0) | (2.0) |
| Assumed rate of return | 15.5 | 14.4 | 17.6 |

The average assumed rate of return for the years in issue was 15.8 percent.

### 2. Time Period and Calculation

The parties computed the compound growth rates of petitioner's shareholders' equity for 20-year and 10-year periods. Instead of using compound growth rates to determine whether an independent investor would be satisfied with the return on its investment, this Court has generally calculated a corporation's ROE by dividing its net income after tax for a specific year by its shareholders equity. See B & D Foundations, Inc. v. Commissioner, T.C. Memo. 2001-262 (discussing the ROE

calculation in greater detail); Labelgraphics, Inc. v. Commissioner, T.C. Memo. 1998-343, affd. 221 F.3d 1091 (9th Cir. 2000). Shareholder equity is either the corporation's shareholders' equity at the beginning of that year, e.g., Alpha Med., Inc. v. Commissioner, T.C. Memo. 1997-464 at n.8, revd. on other grounds 172 F.3d 942 (6th Cir. 1999), the shareholders' equity at the end of the year, e.g., Labelgraphics, Inc. v. Commissioner, supra, or the year's average shareholder equity, e.g., Dexsil Corp. v. Commissioner, 147 F.3d 96, 99 (2d Cir. 1998), affg. T.C. Memo. 1995-135; see B & D Foundations, Inc. v. Commissioner, supra. We shall apply the general ROE approach in this case using petitioner's shareholders' equity at the beginning of each tax year in issue.

Moreover, the parties do not agree on the appropriate time period to determine whether petitioner's shareholders' ROE would satisfy an independent investor. Petitioner argues that we should review the entire period it has been incorporated. Respondent argues that an independent investor would find the 10-year period ending with 2000, the last year in issue, to be a more accurate representation of its investment. If we were to consider petitioner's tax years outside of the 3 years in issue, we would be inclined to review the entire period it has been incorporated. However, given the facts of this case, an analysis focused on the years in issue is more appropriate.

Respondent also relies on <u>Alpha Med., Inc. v. Commissioner</u>, <u>supra</u>, and <u>Eberl's Claim Serv., Inc. v. Commissioner</u>, T.C. Memo. 1999-211, affd. 249 F.3d 994 (10th Cir. 2001), for the proposition that the ROE should be analyzed only for each tax year in issue separately. Petitioner argues that respondent's analysis should not be relied on because he incorrectly interpreted this Court's jurisprudence.

We agree that the independent investor would initially focus on each of the 3 years in issue separately. However, respondent's reliance on <u>Alpha Med., Inc.</u> and <u>Eberl's Claim Serv., Inc.</u> is partially misplaced. Unlike those cases, the total capital investment of $11,300, as of 1982, made by the shareholder-employees in this case was not de minimis considering a competitor could establish a drywall construction business with only $300. Also, in this case, there are three shareholder-employees, compared to a single shareholder-employee in each of those cases. These differences sufficiently distinguish this case from the reasoning used in <u>Alpha Med., Inc.</u> and <u>Eberl's Claim Serv., Inc.</u> to view the years in issue only separately. Thus, we shall consider the years in issue collectively and separately.

Petitioner's ROE for the tax year ended June 30, 1998, was 7.8 percent, for the tax year ended June 30, 1999, negative 4.1

percent, and for the tax year ended June 30, 2000, 41.3 percent.[4] The average ROE for the 3 years in issue was 15 percent, which is very close to our average assumed rate of return.  The average ROE is slightly less because in the tax year ended June 30, 1999, petitioner had a negative ROE.  However, the fact that petitioner's CEO received less compensation in that year than in any of the previous 5 years and did not receive a bonus in that year nullifies any negative inference we would have drawn.  Instead, these facts support the conclusion that Darle's compensation was in accord with performance, which was reasonable for a CEO.  Furthermore, petitioner's ROE for the tax year ended June 30, 2000, was substantial.  Analyzing the ROE of the years in issue together in this case eliminates anomalies created by fluctuations in a given year.  Therefore, looking at the years before us together, we hold that this factor favors petitioner.

F.  Comparison of Compensation to Gross and Net Income

Compensation as a percentage of a taxpayer's gross and net income has been considered in deciding whether compensation was reasonable.  See RTS Inv. Corp. v. Commissioner, 877 F.2d at 650. The comparison of salaries to net income is more important because it "more accurately gauges whether a corporation is

---

[4]We calculated ROE by dividing the year's net income by the year's beginning total shareholder equity.  We used the figures in the financial documents included in the expert reports to determine ROE.

disguising the distribution of dividends as compensation."
Wagner Constr., Inc. v. Commissioner, T.C. Memo. 2001-160 (citing
Owensby & Kritkos, Inc. v. Commissioner, 819 F.2d at 1325-1326).
Respondent provided a chart that expressed the shareholder-
employees' compensation as a percentage of gross receipts and net
pretax income for tax years ended June 30, 1990 through 2000.
With respect to the years in issue, respondent determined that
the shareholder-employees' compensation was as follows:

| TYE June 30 | Compensation paid to petitioner's shareholders | Gross receipts | Percent | Net income before taxes and shareholder compensation | Percent |
|---|---|---|---|---|---|
| 1998 | $600,000 | $1,857,221 | 32% | $673,651 | 89% |
| 1999 | 592,727 | 1,688,437 | 35 | 548,980 | 108 |
| 2000 | 940,000 | 2,905,034 | 32 | 1,277,316 | 74 |

Petitioner argues that this factor should not be afforded much
weight because Darle, Rocky, and Dean each wore "three hats"--
directors, officers, and key employees--which required them to
perform duties above and beyond their respective titles.

While we disagree with both parties' analyses, we find this
factor favors respondent.  The shareholder-employees'
compensation expressed as a percent of gross income was fairly
consistent in the years in issue and was a significant portion of
the net income.  In some cases, the percentages may be less
indicative because the qualifications of the shareholder-
employees and the nature, extent, and scope of their work support

petitioner's paying them high compensation. See, e.g., <u>Mad Auto</u> <u>Wrecking, Inc. v. Commissioner</u>, T.C. Memo. 1995-153 (deciding this factor to be neutral where the officers' qualifications and the nature, extent, and scope of their work supported high compensation, but where their compensation represented a significant percent of gross income and book net income (before deducting the officers' compensation) and even exceeded the amount of net income in a tax year). However, in this case we think the percentages favor respondent because petitioner's shareholder-employees' compensation was a substantial portion of its net income and even exceeded its net income in the tax year ended June 30, 1999.

### G.  External Comparison

This factor compares the shareholder-employees' salaries to the salaries that similar companies pay for similar employee services. See <u>Elliotts, Inc. v. Commissioner</u>, 716 F.2d at 1246. In this case, salary surveys were used by both parties' experts.

#### 1.  Darle--Petitioner's CEO

With respect to Darle's compensation, Dr. Sliwoski relied on ERI's compensation tables for the comparison. He testified that the proper standard industry code (SIC) for petitioner's drywall construction business was SIC 1742, "Plastering, Drywall, and Insulation". His report included a table which was titled "Table 3:  SIC 1742: Chief Executive Officer Compensation: Years Ended

June 30, 1998 through June 30, 2000". After reviewing the attachments to the report, it is clear that Dr. Sliwoski included data from SIC 1799, "Special Trade Contractors", not SIC 1742. Dr. Sliwoski testified that he used the SIC 1799 data because it includes a broader pool of construction industries than SIC 1742 and provides maximum compensation figures.

Respondent exhorts us to disregard petitioner's expert's report and testimony with respect to the external comparison analyses because they both relied on the incorrect SIC. In this case, we agree such action is warranted because both experts agreed that SIC 1742 was the most relevant, not SIC 1799. See Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938) (holding that the trier of fact is not bound by any expert witness's opinion and may accept or reject expert testimony, in whole or in part, in the exercise of sound judgment).

Mr. Herber correctly used SIC 1742 to compare Darle's compensation. The ERI data indicates the total compensation for CEOs in the 90th percentile[5] was $183,805, $184,499, and $235,270 for 1998, 1999, and 2000, respectively.[6] According to the ERI data, Darle was compensated substantially above similarly situated CEOs whose compensation was in the 90th percentile. On

---

[5]Ninetieth percentile means that only 10 percent of the year's data lies above this figure.

[6]The ERI date was based on calendar years, but the tax years in issue were fiscal years ending on June 30.

the basis of this data, Darle's experience, and petitioner's strong profitability before taxes and shareholder-employee compensation, Mr. Herber estimated a high and low total compensation range.

At first glance, the ERI data from SIC 1742 appears relevant because it is based on the proper SIC and is limited to businesses in the Fargo, North Dakota, area, and it accounts for petitioner's size as measured by revenues. However, the ERI data does not take into account the number of hours the similarly situated CEOs worked or the duties they performed. Darle was solely responsible for determining the amount petitioner would bid on each job. However, the ERI data does not indicate that the CEOs in similar companies also had this responsibility. In addition, Darle performed many tasks that may not be traditionally performed by a CEO. The ERI materials included in the record fail to indicate whether other CEOs performed similar tasks. The ERI data also does not state the business model of the corporations included in its data. It is plausible that CEOs working under different business models may expect to be compensated differently. Considering these facts, we place little weight on these materials and are unwilling to conclude that the ERI data is sufficient for us to find that Darle's compensation was unreasonable.

Mr. Herber relied on the National Institute for Business Management (NIBM) Executive Compensation Survey and the RMA studies in addition to the ERI data to compare Darle's compensation.  The NIBM data Mr. Herber relied on was for companies most similar to petitioner on the basis of overall size in terms of revenues, having sales volume of less than $5 million, and businesses classified as construction, contracting, or extraction.  However, at trial, Mr. Herber testified that NIBM's survey group included industries that were not comparable to petitioner's, including mineral extraction, and we shall not rely on the information contained therein.

Mr. Herber also used the RMA data to compare Darle's compensation, represented as a percentage of income, to a subject group composed of companies in the SIC 1742 category and having revenues similar to petitioner's.  Officer-shareholder compensation is expressed as a percentage of total revenue.  For 1997 through 1999, officer-shareholder compensation represented as a percentage of revenues was as follows:

| Calendar year | 25th percentile | Median | 75th percentile |
|---|---|---|---|
| 1997 | 2.8% | 4.4% | 7.7% |
| 1998 | 3.2 | 5.1 | 7.5 |
| 1999 | 3.7 | 5.0 | 7.4 |

Darle's compensation as a percentage of total revenues for the tax years ended June 30, 1998 through 2000, was 16.2 percent,

16.7 percent, and 15.1 percent, respectively.  These figures indicate that Darle's compensation expressed as a percentage of total revenue exceeded the 75th percentile.

Mr. Herber then attempted to calculate Darle's reasonable compensation using these percentages.  We do not believe that such a computation is possible because the RMA data is provided only up to the 75th percentile.  Nor do we believe that estimating the percentage for petitioner's CEO is appropriate or accurate.

This factor is neutral, with respect to Darle, because the parties failed to provide comparable compensation data that was persuasive.

2.  Petitioner's Other Officers/Job-Site Supervisors

Rocky and Dean both had officer titles but primarily performed duties as job-site supervisors.  Both parties' experts relied on information from the Web site of the Minnesota Work Force Center (MWFC) of the Minnesota Department of Economic Security and determined that Rocky's and Dean's job responsibilities are analogous to those of "construction managers".  The MWFC 1999 salary survey that estimated construction managers' salaries for the fourth quarter 2000 is summarized below.

|  | Average | 10th percentile | 25th percentile | 50th percentile (median) | 75th percentile | 90th percentile |
|---|---|---|---|---|---|---|
| Hourly wage | $26.47 | $15.27 | $20.04 | $24.62 | $28.88 | $42.39 |
| Annual salary | 55,073 | 31,771 | 41,670 | 51,196 | 60,070 | 88,171 |

For each year in issue, Rocky and Dean were each compensated above the 90th percentile annual salary amount. Mr. Herber used the 90th percentile as the starting point to determine the amount of reasonable compensation for their services.

Mr. Herber determined that four additional factors should be taken into consideration when determining whether the shareholder-employees were overcompensated. The first factor considers whether a shareholder-employee's expertise enhanced the corporation's profitability. Mr. Herber determined, and we agree, that Rocky's and Dean's prowess contributed to petitioner's profitability. The second factor considers a shareholder-employee's experience. We have already concluded that both Dean and Rocky had significant and valuable experience. The third factor considers the number of hours the shareholder-employee dedicated to the taxpayer's business. We have also found that Rocky and Dean have both dedicated between 55 and 60 hours per week to petitioner's business. This factor is particularly significant because it appears that the average hourly rate of $26.47 was simply calculated by dividing the average annual wage of $55,073 by 52 weeks and then by 40 hours

per week.  This simple calculation indicates that Rocky and Dean were deserving of compensation beyond that contained in the MWFC tables.  The final factor considered was the level of management required for the drywall installation business versus overseeing the construction of an entire building.  Clearly, the level of supervision is less in the drywall business as it is merely an aspect of constructing an entire building.  Considering these factors, we hold that Dean and Rocky deserved to be compensated above the 90th percentile as found in the MWFC data.

Annualizing the 90th percentile hourly wage on the basis of a 55-hour work week reveals that Rocky and Dean would have received about $121,235 in compensation per year.  Rocky and Dean would have then received compensation that exceeded the 90th percentile annual income adjusted for the number of hours worked by 23.7 percent for tax years ended June 30, 1998 and 1999, and 100.6 percent for the tax year ended June 30, 2000.  Taking into consideration the four factors that Mr. Herber identified, we believe that Rocky and Dean deserved to be compensated above this adjusted amount.  Their experience and the nature, extent, and scope of their work support this conclusion.  After weighing all the facts, we find this factor to be neutral.

H.  Petitioner's Salary Policy as to All Employees

Courts have considered the salary policy of the taxpayers as to all employees (sometimes referred to as internal consistency) in determining whether its shareholder-employees received reasonable compensation.  See Charles Schneider & Co. v. Commissioner, 500 F.2d at 152; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1159.  This factor is probative because it questions whether the shareholder-employees, because of their status as such, were compensated differently from petitioner's other employees.  See Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1329.  For example, a reasonable, longstanding, and consistently applied compensation plan is evidence of reasonable compensation.  See Elliotts, Inc. v. Commissioner, 716 F.2d at 1247.

In this case, petitioner paid bonuses to its non-shareholder-employees and shareholder-employees.  The bonuses that the nonshareholders received were not paid annually, appeared never to exceed their respective annual compensation, were relatively insignificant in amount, and were not part of a longstanding, consistently applied compensation plan.

Conversely, the bonuses paid by petitioner to its shareholder-employees were paid annually (except that Darle did not receive a bonus in 1997, 1998, or 1999), and they often exceeded each shareholder-employee's base annual salary.  More

importantly petitioner paid its shareholder-employees annual bonuses regularly, unlike its non-shareholder-employees. On the basis of these facts, this factor favors respondent.

I.  Petitioner's Pretax Profit Margin

Petitioner claims that its pretax profit margin before shareholder-employee compensation indicates that it was exceptionally well managed. The pretax profit margin before shareholder-employee compensation was calculated by dividing the pretax net income before shareholder-employee compensation expense by annual sales. Conversely, respondent argues that petitioner's mean pretax profit margins after shareholder compensation for the years at issue and over a 10-year period were virtually identical to the industry average.

After comparing petitioner's pretax profit margin before shareholder-employee compensation to RMA's annual statement studies, which were for SIC 1742, we find that petitioner had an exceptional pretax profit margin before shareholder-employee compensation for each tax year in issue. This indicates petitioner's shareholder-employees were deserving of high compensation. However, we are mindful that petitioner's pretax profit margin after shareholder compensation was not exceptional, and the compensation paid to petitioner's shareholder-employees depleted its earnings significantly. Nevertheless, we find this factor to be neutral for each year in issue because the profit

margin after shareholder compensation was near the industry average, and we see no compelling reason to require an above-average return.

VII.  Conclusion

A preponderance of the evidence shows that petitioner's shareholder-employees were reasonably compensated for each year in issue.  Therefore, petitioner may deduct in full the compensation it paid to Darle, Dean, and Rocky for each year in issue.

To reflect the foregoing and give effect to the parties' concessions,

Decision will be entered under Rule 155.